**UNITED STATES of America**

v.

**Jeff FORT, Appellant.**

**No. 22746.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 12, 1970.

Decided Dec. 14, 1970.

As Amended Dec. 31, 1970.

Certiorari Denied June 21, 1971.

See 91 S.Ct. 2255.

See also 133 U.S.App.D.C. 155, 409 F.2d 441.

Messrs. Marshall Patner and William W. Brackett, Chicago, Ill., for appellant.

Mr. John A. Terry, Asst. U. S. Atty., with whom Mr. Thomas A. Flannery, U. S. Atty., was on the brief, for appellee. Messrs. David G. Bress, U. S. Atty., at the time the record was filed, and John D. Aldock, Asst. U. S. Atty., also entered appearances for appellee.

Before TAMM, ROBINSON and Mac-KINNON, Circuit Judges.

MacKINNON, Circuit Judge:

Appellant was convicted on two counts of being in contempt of Congress on July 9, 1968 in violation of 2 U.S.C. § 192.[1] He is here appealing this conviction.

1. That section provides:

Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

The Senate proceedings out of which this conviction ultimately arose originated with the Permanent Subcommittee on Investigations of the Senate Committee on Government operations. Under the Standing Rules of the Senate a committee on Government Operations is required to be appointed at the commencement of each Congress, with duties which include that of:

> "(B) studying the operations of Government activities at all levels with a view to determining its *economy* and *efficiency*. \* \* \*" (Emphasis added.)[2]

All Standing Committees of the Senate are empowered to act as such and through subcommittees[3] and "may make investigations into any matter within [their] jurisdiction."[4] Also from time to time the Senate by separate resolutions makes money available for certain investigations it considers necessary in furtherance of its legislative responsibilities and in such resolutions directs the committee to undertake the investigations and outlines the general scope of the matter to be investigated. The powers conferred by such resolutions are in addition to the standing powers of the committees and subcommittees.

On March 15, 1968, the Senate adopted Senate Resolution 216 authorizing its Committee on Government Operations "or any subcommittee thereof \* \* \* from February 1, 1968 through January 31, 1969, to make investigations into the *efficiency and economy of operations* of all branches of the Government \* \* \* *waste* \* \* \* and to make a full and complete study and investigation of *riots, violent disturbances of the peace,* vandalism, civil and *criminal disorder,* insurrection, the commission of crimes in connection therewith \* \* \*"[5]

2. Rules and Manual, United States Senate, Rule XXV, pp. 26, 33–34 (1967).

3. *Id.* at 4 [25.3]; p. 61 [45.1], Legislative Reorganization Act of 1946, ch. 753, 60 Stat. 812. The name of the Committee on Expenditures in the Executive Departments was later changed to the Committee on Government Operations. S.Jour., 82nd Cong., 2nd Sess. 127 (March 3, 1952).

4. Legislative Reorganization Act of 1946, ch. 753, § 134(a), 60 Stat. 832.

5. The Resolution provided in relevant part:

> *Resolved,* That, in holding hearings, reporting such hearings, and making investigations as authorized by section 134 of the Legislative Reorganization Act of 1946 and in accordance with its jurisdiction under rule XXV of the Standing Rules of the Senate, the Committee on Government Operations or any subcommittee thereof is authorized from February 1, 1968, through January 31, 1969, to make investigations into the efficiency and economy of operations of all branches of the Government, including the possible existence of fraud, misfeasance, malfeasance, collusion, mismanagement, incompetence, corrupt or unethical practices, waste, extravagance, conflicts of interest, and the improper expenditure of Government funds in transactions, contracts, and activities of the Government or of Government officials and employees and any and all such improper practices between Government personnel and corporations, individuals, companies, or persons affiliated therewith, doing business with the Government; and the compliance or noncompliance of such corporations, companies, or individuals or other entities with the rules, regulations, and laws governing the various governmental agencies and its relationships with the public: *Provided,* That, in carrying out the duties herein set forth, the inquiries of this committee or any subcommittee thereof shall not be deemed limited to the records, functions, and operations of the particular branch of the Government under inquiry, and may extend to the records and activities of persons, corporations, or other entities dealing with or affecting that particular branch of the Government.
>
> \*    \*    \*    \*    \*
>
> Sec. 5. The Committee on Government Operations or any duly authorized subcommittee thereof is authorized and directed until January 31, 1969, to make a full and complete study and investigation of riots, violent disturbances of the peace, vandalism, civil and criminal disorder, insurrection, the commission of

Previously on August 11, 1967, the Senate had adopted Senate Resolution 150 authorizing the Government Operations Committee and any duly authorized subcommittee thereof to make a full and complete study and investigation of all other aspects of *crime* and *lawlessness* within the United States which have an impact upon or affect the national health, welfare and safety [6] and of other subjects. With the authority above described, the Senate Committee on Government Operations, through its Permanent Subcommittee on Investigations, in the summer of 1968 was in the process of holding hearings on the subjects of riots and civil disorders in the United States.[7] A subpoena directing appellant to appear before the Subcommittee in Washington, D. C., to testify was issued over the signature of the chairman, Senator John L. McClellan, and was served on appellant in Chicago on May 22, 1968.[8] By letter dated July 1, 1968, appellant's counsel acknowledged receipt of the subpoena and submitted the following requests to the Subcommittee:

Chicago, Ill., July 1, 1968.
Hon. Chairman and Members of the Subcommittee on Investigations of the Committee on Government Operations of the United States Senate:

My client, Mr. Jeff Fort, has been subpoenaed to appear before this committee concerning an investigation of the Woodlawn area job training project, Chicago, Ill., funded by the Of-

crimes in connection therewith, the immediate and longstanding causes, the extent and effects of such occurrences and crimes, and measures necessary for their immediate and long-range prevention and for the preservation of law and order and to insure domestic tranquility within the United States.

Sec. 6. The Committee on Government Operations or any of its duly authorized subcommittees shall report to the Senate by January 31, 1969, and shall, if deemed appropriate, include, in its report specific legislative recommendations.

S.Res. 216, 90th Cong., 2d Sess., 114 Cong.Rec. 6705–06 (1968).

Other sections of the resolution authorize investigation into the field of labor relations, syndicated or organized crime and crime and lawlessness but the indictment only referred to offenses related to the above-quoted provisions of the authorizing resolution.

6. The relevant part of the Resolution provided:

"Sec. 4. The Committee on Government Operations or any duly authorized subcommittee thereof is authorized and directed until January 31, 1968, to make a full and complete study and investigation of all other aspects of crime and lawlessness within the United States which have an impact upon or affect the national health, welfare, and safety."

S.Res. 150, 90th Cong., 1st Sess., 113 Cong.Rec. 22425 (1967).

Section 5 of this resolution was duplicated by section 5 of S.Res. 216. This indi-

cates that such resolutions were primarily the means of making money available for specified investigations. The resolutions provided money and authority but the authority was supplemental to the standing powers of the committees.

7. *See* pp. 682–684 *infra* for a discussion of the scope of the inquiry and appellant's relation thereto.

8. The subpoena and return thereon follow:
"United States of America
"Congress of the United States
"To: Jeff Fort, 6046 Dorchester, Chicago, Illinois, Greeting:
"Pursuant to lawful authority, you are hereby commanded to appear before the Senate Permanent Subcommittee on Investigations of the Government Operations Committee of the Senate of the United States, on June 4, 1968, at 10 o'clock a. m. at their committee room, Room 101, Old Senate Office Building, Washington, D. C., then and there to testify what you may know relative to the subject matters under consideration by said committee.
"Hereof fail not, as you will answer your default under the pains and penalties in such cases made and provided.
"To J. N. Tierney, U. S. Marshal, by Herbert L. Lowe, Deputy, to serve and return.
"Given under my hand, by order of the committee, this 20th day of May, in the year of our Lord one thousand nine hundred and sixty-eight.
"John L. McClellan,
"Chairman, Senate Permanent Subcommittee on Investigations of the Government Operations Committee.
"[Back of Subpoena]
"May 22, 1968.
"I made service of the within subpoena by serving personally * * * the within-named Jeff Fort at 2600 California in the courtroom of Judge Wexler at 11:30 o'clock A.M., on the 22nd day of May, 1968.
"Herbert L. Lowe, Deputy."
114 Cong. Rec. 22352 (1968).

fice of Economic Opportunity. On behalf of Mr. Fort, I hereby request and demand:

1. That each person who has made statements or presented evidence before this subcommittee, either orally or in any written form, including by affidavit, which tends to defame Mr. Fort or otherwise adversely affect his reputation, and any persons who shall hereafter do so, be called to appear personally before this subcommittee and at such time to be confronted personally by Mr. Fort and his undersigned counsel, after reasonable notice to Mr. Fort and said counsel of the time and place of such personal appearance by each such person.

2. That the undersigned counsel for Mr. Fort be permitted to personally orally cross-examine, in a reasonable manner, said persons described in paragraph 1, above.

3. Mr. Fort also requests and demands the right to present additional evidence as to the issues described in paragraph 1, above.

Respectfully submitted.

Marshall Patner

Attorney for Mr. Jeff Fort.

On July 9, 1968, pursuant to the subpoena, appellant and his counsel appeared before the Subcommittee in Room 3302, New Senate Office Building, Washington, D. C., and at that time the chairman ruled on the requests. The chairman ruled that the first request would be granted in the discretion of the Subcommittee upon appellant's request for a given witness. The second request was denied as being unauthorized under the rules of the Subcommittee.[9] A ruling on the third request was deferred until after the appellant had testified.[10]

The chairman then asked appellant to state his name and appellant did so. However, when appellant was asked to state his address, his counsel interjected that he must instruct his client not to participate further in the proceedings without the right to cross-examination. The chairman again denied this request, and appellant was again asked to state his address; thereupon the appellant and his counsel withdrew from the hearing room. In due course on July 19, 1968 the entire record in the matter was presented to the Senate in the form of a resolution, designated S.Res. 379, and the Senate by a roll call vote of 80 to 19 adopted said resolution directing that the report of its Committee on Government Operations on the appearance on July 9, 1968 of Jeff Fort before the Senate Permanent Subcommittee on Investigations of the Committee on Government Operations, together with all the facts in connection therewith, be certified to the United States Attorney for the District of Columbia, to the end that the said Jeff Fort might be proceeded against in the manner and form provided by law.[11] Appellant was thereafter indicted for contempt by a grand jury in the District of Columbia and there brought to trial.

The Government's only witness at trial was Mr. Lavern J. Duffy, an assistant counsel to the Subcommittee, but additional facts were stipulated. Mr. Duffy testified that he had been directed by the Subcommittee to conduct an investigation of riots in three cities, one of which was Chicago. He stated that during the course of his in-

---

9. Rule 11 of the Subcommittee's rules provides:

> Interrogation of witnesses at Subcommittee hearings shall be conducted on behalf of the Subcommittee by Members and authorized Subcommittee staff personnel only.

Rules of Procedure for the Senate Permanent Subcommittee on Investigations of the Committee on Government Operations (Comm. Print 1968).

10. *See* Hearings pursuant to S.Res. 216 before the Permanent Subcommittee on Investigations of the Senate Committee on Government Operations, 90th Cong., 2d Sess., Part 12, pp. 2545–2546 (1968).

11. 114 Cong.Rec. 22351–22362 (1968).

vestigation in Chicago, he learned that the Office of Economic Opportunity (OEO) had funded a project in the amount of $927,431 to set up a training program for two "youth gangs" in Chicago. His investigation disclosed that appellant was vice-president of one of these gangs, the Blackstone Rangers, and was on the payroll at a salary of $6,000 a year as a "Center Chief" of the Woodlawn Organization, the entity which had received the OEO grant. Mr. Duffy further testified that he conveyed this information to the Subcommittee, that the Subcommittee issued a subpoena to appellant, and that at the hearing appellant refused to state his address or anwer any other questions. The Government also introduced (1) the opening statement of the chairman of the Subcommittee, which outlined the scope of the hearings, (2) the letter which appellant's counsel had written to the Subcommittee [12] and (3) the subpoena itself. The Government then rested.

The court received certain items of evidence solely for consideration in connection with matters of law for the court and other evidence was admitted for consideration by the jury on factual issues. Other than such evidence as was stipulated to by counsel, appellant put in no evidence. However, during closing argument appellant's counsel attempted to persuade the jury that appellant was not aware of the pertinency of the questions to the purpose of the hearings.

This was his principal argument to the jury and he referred to it by numerous remarks sprinkled throughout his argument. In arguing this point counsel at one place stated:

"There is no showing that he [Fort] was ever given a copy of the opening statement that Mr. McClellan made."

At another point in his argument counsel remarked:

"The only thing we did was we wrote a letter, for certain reasons which are not before you, but that doesn't show that we knew all those things. It doesn't show that we had the opening statement and no one has shown that we had the opening statement and no one showed why there was no opportunity, and it hasn't been proved. It's missing."

At the close of counsel's argument the United States Attorney objected to the inference that appellant had no knowledge of the opening statement of the chairman because it had been stipulated by both counsel (and admitted as relevant on those issues involving matters of law which the court had to decide) that:

"The defendant's counsel purchased daily copy from June 20, 1968 through October 11, 1968. The cover sheet of each daily transcript delivered to the defendant's counsel on the day following each hearing; including the hearings of July 1, July 2, and July 3, correctly referred to the meeting as follows: 'The Subcommittee met at * * * (time and date) in Room 3302, Senate Office Building, pursuant to Senate Resolution 216, agreed to March 15, 1968. * * *'

"Attached hereto as Exhibit A is a printed pamphlet entitled 'Rules of Procedure' bearing the date March 15, 1968. It is agreed that a copy of said pamphlet was in the possession of defendant's counsel in Washington, D. C. on July 1, 1968." (Stipulation B.)

On the basis of these stipulations the United States Attorney requested and was allowed by the court to argue that appellant's counsel had a copy of the chairman's opening statement prior to appellant's appearance in front of the Subcommittee and to urge the inference that appellant therefore knew the pertinency of the questions.

The jury, on December 5, 1968, returned a verdict of guilty on both

12. *See* p. 673, *supra*.

counts of the indictment,[13] and the court on January 24, 1969, following receipt of a probation report, ordered appellant committed to the custody of the Attorney General for "observation and study" pursuant to the Youth Corrections Act.[14]

On this appeal appellant argues that his conviction must be reversed on the grounds that (1) the contempt statute under which he was convicted is unconstitutional, (2) the Subcommittee erroneously refused to grant appellant certain claimed constitutional rights and committed certain procedural errors, and (3) he was deprived of a fair trial by virtue of the exclusion of certain evidence and by prosecutorial comment on matters not in evidence. We find all of these contentions to be unpersuasive and affirm. We shall consider appellant's arguments in order.

## I

■ Appellant first challenges the contempt statute, 2 U.S.C. § 192, as being in violation of the necessary and proper clause of Article I § 8 of the United States Constitution.[15] He argues that the inherent power of Congress to compel testimony by means of civil contempt is the means best calculated to achieve the legitimate congressional end of obtaining information and conversely that criminal contempt, by punishing rather than coercing and by failing to provide a means for the recalcitrant witness to purge himself of his contempt, is not a rational means to achieve the congressional end.

The contempt of Congress statute, which is today 2 U.S.C. § 192, was originally enacted in 1857.[16] Prior to that date, Congress had relied on its inherent powers of civil contempt to compel information. Under this procedure, the witness who refused to testify was committed to the Sergeant-at-Arms of the respective House until he was willing to "purge" himself of his contempt by supplying the requested information,[17] but his confinement could not extend beyond the term of the session,[18] and could always be challenged by habeas corpus.[19]

However, in 1857, Congress determined that more severe sanctions were necessary to compel testimony, and the forerunner of the present contempt statute was passed in order " * * * to

13. The first count of the indictment charged appellant with refusing to state his place of residence; the second count charged him with refusing to answer any question to be asked him by the Subcommittee.

14. The pertinent section provides:
     If the court desires additional information as to whether a youth offender will derive benefit from treatment under subsections (b) or (c) it may order that he be committed to the custody of the Attorney General for observation and study at an appropriate classification center or agency. Within sixty days from the date of the order, or such additional period as the court may grant, the Division shall report to the court its findings.
     18 U.S.C. § 5010(e). This observation and study has not yet been carried out. See p. 686, infra.

15. U.S.Const. art. I, § 8:
     The Congress shall have Power * * * to make all Laws which shall be necessary and proper for carrying

into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

16. Act of January 24, 1857, ch. 19, § 1, 11 Stat. 155.

17. See Watkins v. United States, 354 U.S. 178, 207 n. 45, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957). 3 Hind's Precedents § 1669 (1907). See generally C. Beck, Contempt of Congress (1959); Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv. L.Rev. 153 (1926); Potts, Power of Legislative Bodies to Punish for Contempt, 74 U.Pa.L.Rev. 691, 780 (1926).

18. Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821).

19. See, e. g., Kilbourn v. Thompson, 103 U.S. 168, 177, 26 L.Ed. 377 (1881); Potts, Power of Legislative Bodies to Punish for Contempt, supra note 17, at 789.

inflict a greater punishment than the committee believe the House possesses the power to inflict." Cong.Globe, 34th Cong., 3d Sess. 405. That statute was held constitutionally valid by this court in Chapman v. United States, 5 App. D.C. 122 (1895). We there stated:

> That Congress possessed the constitutional power to enact a statute to enforce the attendance of witnesses and to compel them to make disclosure of evidence to enable the respective bodies to discharge their legitimate functions, cannot admit of serious questions. Congress is invested with all the legislative power of the Government, and each House also with certain other powers, not legislative in their nature; and it is expressly provided that Congress shall have power to make all laws which shall be necessary and proper for carrying into execution the powers vested in it. Const. Art. 1, Sec. 8, Par. 18. Under this grant of power, what more natural and appropriate, as a means *of executing its powers and indeed necessary*, than a statute providing for the discovery of evidence as the basis of action, and prescribing a punishment for those who contemn the authority of the body, and, by their contumacious conduct, obstruct *the lawful exercise of its functions?* We have no doubt of the power of Congress in this respect.

*Id.* at 130–131.

This court's ruling was upheld on appeal by the Supreme Court. In re Chapman, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154 (1897). The Supreme Court agreed that Congress possessed the power to enact the contempt statute, stating "[i]t was an act *necessary and proper* for carrying into execution the powers vested in congress and in each

house thereof." *Id.* at 671, 17 S.Ct. at 681. (Emphasis added.) Subsequent cases have upheld the proposition that the contempt statute provides remedies in addition to the remedies available under the inherent power of Congress to punish for contempt. *See* Jurney v. MacCracken, 294 U.S. 125, 151–152, 55 S.Ct. 375, 79 L.Ed. 802 (1935); Fields v. United States, 82 U.S.App.D.C. 354, 357, 164 F.2d 97, 100 (1947), cert. denied, 332 U.S. 851, 68 S.Ct. 355, 92 L.Ed. 421 (1948). A necessary corollary of these cases is that Congress is not to be limited to the remedy of civil contempt which is always available to it under its inherent powers if it considers such remedy appropriate in a particular case; indeed, it may "coerce" by means of civil contempt, "punish" by means of criminal contempt, and perhaps even both. *See* Jurney v. MacCracken, supra, 294 U.S. at 151–152, 55 S.Ct. 375; In re Chapman, *supra*, 166 U.S. at 672, 17 S.Ct. 677.

Appellant's argument seeks to avoid the impact of these decisions by attacking the wisdom of the use of criminal contempt proceedings in the circumstances of this case. He suggests that an alternate procedure which would permit the witness to judicially challenge the legality of the inquiry or procedures, and then to purge himself of his contempt by testifying if his contentions were not judicially upheld, would best serve the congressional purpose of obtaining information while relieving the individual witness of the dilemma of "act[ing] at his peril" [20] in which the use of criminal contempt places him.[21] This is not an unreasonable suggestion; in fact, this court some years ago made the same suggestion to Congress. In Tobin v. United States, 113 U.S.App.D.C. 110, 306 F.2d 270, cert. denied, 371 U.S. 902, 83 S.Ct.

---

20. Chapman v. United States, 5 App.D.C. 122, 136 (1895). *See also* Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692 (1929).

21. For a discussion of the problems presented by the present statute, see Marlow,

Fair Procedure in Congressional Investigations: A Proposed Code, 54 Colum.L. Rev. 839, 882–85 (1954); Sky, Judicial Review of Congressional Investigations: Is There An Alternative to Contempt, 31 Geo.Wash.L.Rev. 399 (1962).

206, 9 L.Ed.2d 165 (1962), the court, anticipating potential constitutional problems if Congress pursued further the inquiry under attack, stated:

> Especially do we say this in view of the unusual nature of the present case where we are asked to decide essentially civil and jurisdictional issues at the same time that we establish criminal precedent. The conflicting duality inherent in a request of this nature is not particularly conducive to the giving of any satisfactory answer, no matter what the answer should prove to be. Should this controversy be resumed, it is hoped that Congress will first give sympathetic consideration to Judge Youngdahl's eloquent plea:
>
>> "During the House debate on the contempt citation, the Committee inserted in the *Congressional Record* a memorandum purporting to show that declaratory judgment procedures were not an available means for procuring judicial resolution of the basic issues in dispute in this case. Although this question · is not before the Court, it does feel that if contempt is, indeed, the only existing method, Congress should consider creating a method of allowing these .issues to be settled by declaratory judgment. Even though it may be constitutional to put a man to guessing how a court will rule on difficult questions like those raised in good faith in this suit, what is constitutional is not necessarily most desirable. * * *" 195 F.Supp. [588] at 616–617.

*Id.* at 116, 306 F.2d at 276.

However, the controlling fact is that Congress did not follow this suggestion, and it is not our province to strike down a means reasonably calculated to accomplish a concededly valid congressional end on the grounds that someone may be able to perceive of an arguably better means to accomplish that end. Congress decided in 1857 that it was necessary to add criminal contempt powers to its inherent powers to insure the cooperation of witnesses; this decision provided a rational basis upon which to enact the challenged statute, and that decision is no less valid today. The statute is constitutional.

## II

The appellant next argues that the Subcommittee erroneously withheld his constitutional rights to confront and cross-examine those who had allegedly defamed him and to introduce evidence in his own behalf, and that his refusal to testify was thereby justified.

The Constitution is, of course, applicable to any governmental action, including the action of congressional subcommittees. Watkins v. United States, 354 U.S. 178, 187–188, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957). But which constitutional rights are applicable depends on the nature and consequences of the governmental action. Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed. 2d 1307 (1960). Thus certain protections of the Constitution may rightfully be claimed by a witness called to testify before a congressional subcommittee, such as the right not to incriminate himself, the right to be free of unreasonable searches and seizures and the right not to have his First Amendment freedoms abridged. Watkins v. United States, *supra*, 354 U.S. at 187–188, 77 S.Ct. 1173. Obviously, the consequences of the denial of these rights are no less severe merely because their denial is brought about by a congressional subcommittee. For example, an unreasonable search and seizure is no less illegal if conducted pursuant to a subpoena of a congressional subcommittee than if conducted by a law enforcement official. The same is true of the privilege against self-incrimination and First Amendment freedoms. However, when we consider the rights requested here by the appellant, we are dealing with an entirely different matter. The right to present evidence in one's own behalf and to con-

front and cross examine one's accusers are rights designed to protect the individual's interests when the Government seeks to impose criminal sanctions upon him. But the plain fact is that the congressional investigation with which we are here concerned is an investigative proceeding and not a criminal proceeding, and in such proceeding Congress is not empowered to adjudicate criminal sanctions on the witness.[22] These are the distinguishing features of a congressional investigation that cause such proceedings to be outside the guarantees of the due process clause of the Fifth Amendment and the confrontation right guaranteed in criminal proceedings by the Sixth Amendment. In Hannah v. Larche, *supra*, 363 U.S. at 444–445, 80

S.Ct. at 1516, a case involving an analogous factual situation in a hearing before the Civil Rights Commission in which the petitioners raised objections similar to those raised here by appellant,[23] the Court observed:

"A frequently used type of investigative agency is the legislative committee. The investigative function of such committees is as old as the Republic. The volumes written about legislative investigations have proliferated almost as rapidly as the legislative committees themselves, and the courts have on more than one occasion been confronted with the legal problems presented by such committees. The procedures adopted by legislative investigating committees have varied

---

22. We are not persuaded that the Subcommittee had departed from its valid investigatory purpose and was engaged in a legislative trial of appellant as the accused. Actually the Subcommittee was attempting to determine whether moneys previously appropriated by Congress had been properly expended, so that the Congress could amend its procedures and conditions in the future to correct such deficiencies as might be uncovered. Such inquiry allows for the broadest investigation and is one of the most valid of legislative purposes. It is true that prior testimony before the Subcommittee had mentioned Fort's name, but he had available to him the procedures of Rule 13 of the Subcommittee Rules, *supra* note 9, which provides:

Any person whose name is mentioned or who is specifically identified, and who believes that testimony or other evidence presented at a public hearing, or comment made by a Subcommittee Member or Counsel, tends to defame him, or otherwise adversely affect his reputation, may (a) request to appear personally before the Subcommittee to testify in his own behalf, or, in the alternative, (b) file a sworn statement of facts relevant to the testimony or other evidence or comment complained of. Such request and such statement shall be submitted to the Subcommittee for its consideration and action.

Appellant's counsel had a copy of all the Subcommittee Rules. If he had wished to correct any prior testimony he could have availed himself of the privileges afforded by Rule 13. He did not do so. Also, with respect to appellant's request

that prior witnesses who had defamed him be recalled and be "confronted personally" by appellant and his counsel, the ruling was that same would be granted in the discretion of the Subcommittee upon appellant's request for a given witness. Thus, there was no unfairness present in the proceedings.

23. *Hannah* involved a challenge to the rules of procedure of the Commission acting under the Civil Rights Act of 1957 in order to investigate complaints that citizens had been discriminatorily deprived of the right to vote on account of their race, color, religion or national origin. The Commission had summoned certain registrars of voters and private citizens of the State of Louisiana to appear at a hearing. These registrars and private citizens challenged the authority of the Commission to hold the hearings and argued in relevant part that the failure of the rules of the Commission to provide an opportunity for their confrontation with and cross-examination of the complaining witnesses violated the Due Process Clause of the Fifth Amendment.

The Court held that these rights were not required by the Due Process Clause in the context of a fact-finding hearing by the Civil Rights Commission. In reaching this conclusion, the Court made the comparison with a legislative investigative committee quoted in the text above. Thus *Hannah* provides analogous support for the proposition that the Constitution does not require the rights contended for in the instant case to be granted a witness in front of a congressional investigating committee.

over the course of years. Yet, the history of these committees clearly demonstrates that only infrequently have witnesses appearing before congressional committees been afforded the procedural rights normally associated with an adjudicative proceeding. *In the vast majority of instances, congressional committees have not given witnesses detailed notice or an opportunity to confront, cross-examine and call other witnesses.*" (Emphasis added.) [Footnotes omitted.]

The right of cross-examination has in the past been granted to some witnesses in front of congressional investigating committees, specifically during the Army-McCarthy hearings of 1954. Special rules for this unusual proceeding were in fact adopted by the Committee on Government Operations, with a limited right of cross-examination granted to Senator McCarthy (who was implicated and who appeared as a witness at these particular hearings). *See* S.Rep. No. 2507, 83d Cong., 2d Sess. 2–3 (1954).

However, the rules adopted for that hearing specifically provided that "[b]ecause of the peculiar nature of the current controversy and the unusual problems created because of the individuals involved, these procedural rules are not in any way to establish a precedent." *Id.* at 3.

Analogous authority may be taken from the procedures followed by the committees of the House of Representatives. There is no provision for cross-examination by a witness in front of a House investigating committee. *See* 3 Hind's Precedents § 1768 (1907). However, House committees have on occasion allowed witnesses to cross-examine.[24] A review of the precedents indicates that committees of Congress have allowed cross-examination of witnesses by members or by persons who were not members of Congress in certain special types of proceedings. These include impeachment trials,[25] investigations looking toward impeachment,[26] proceedings involving the privileges of a member[27] and when a committee is directed to determine whether there have

---

24. While it does not constitute any portion of the basis for our decision here, we also note that the Subcommittee, in ruling on appellant's request, did authorize him to submit questions for the Subcommittee to present. Specifically, the chairman stated:

> Your request No. 2, that the undersigned counsel for Mr. Fort be permitted to personally orally cross-examine in a reasonable manner said persons described in paragraph 1 above cannot be granted under the rules of the committee.
>
> You may submit questions for the committee to present, to ask witnesses that may have appeared or may appear to testify with respect to your client.
>
> The committee will weigh those questions and if proper will ask the questions.

*Hearings, supra* note 10, at 2546. Since appellant's principal objection was directed against witnesses who had *already* testified or submitted affidavits, the permission granted by the Subcommittee was a very substantial one. Appellant could have framed detailed and specific questions on all the defamatory matter he was complaining about.

25. 3 Hind's Precedents § 2168 (1907).

26. *Id.* § 2403 (a Member of the House not a member of the committee investigating possible grounds to impeach President Johnson was permitted to examine witnesses) ; *id.* § 2491 (Judge Thurston) ; *id.* § 2497 (Judge Watrous) ; *id.* § 2445 (Secretary of War Belknap) ; 6 Cannon's Precedents § 498 (Judge Archbold) ; *id.* § 526 (Judge Hanford) ; *id.* § 527 (Judge Speer) ; *and see* 3 Hind's Precedents § 1741 (1907) involving an investigation of Secretary of the Treasury Crawford ; and *id.* § 2445 involving an investigation of Secretary of the Treasury Sherman who was permitted to summon witnesses.

27. 3 Hind's Precedents § 1644 (Members who had been concerned in a duel which resulted in the death of a Member were permitted to attend and cross examine witnesses during the investigation) ; *id.* § 1841 (permitted further interrogations after investigating committee received written statements for Senate and House Members and others) ; *id.* § 1848 (investigation of assault on Senator Sumner; House Committee informed House Member he could read testimony, testify himself and summon witnesses).

been violations of the election laws.[28] Such variances in committee procedures from the procedures followed here are based on substantial differences in the nature of the investigations, are permissible under the power of a committee to adopt rules of procedure it considers to be appropriate for the examination ·of witnesses in a given investigation [29] and do not help appellant.

■ This is merely an investigation to determine and report the circumstances surrounding the expenditure of moneys appropriated by Congress.

■ Appellant also contends that his request for the right to cross-examine witnesses was improperly denied by the chairman without submitting the request to a vote of the Subcommittee. At the time of the chairman's ruling, three members of the Subcommittee were in attendance, Senators McClellan, Mundt and Curtis. There is nothing in the Subcommittee rules or any rule of parliamentary procedure that requires the matter to be submitted to a formal vote of the Subcommittee.

The chairman presides at sessions of the committee [30] and, under the well established rules of parliamentary procedure, the presiding officer decides procedural questions by ruling thereon.[31] After such ruling if any member then objects to the ruling, he voices it and the chairman thereupon states "Shall the question be put?" and the members present vote thereon. This is the proper method and in the absence of objection the ruling stands by unanimous consent.[32] At the time of appellant's appearance the other two Senators, who were present and participating, prior to their Senate service had previously served for many years as active members of the House of Representatives [33] and could not fail

28. *Contestees have been permitted to cross examine witnesses since the first election contest in 1789, 1 Hind's Precedents §§ 420, 717 (1907).*

29. *See 3 Hind's Precedents §§ 1841, 1842 (1907); 6 Cannon's Precedents § 377 (1936).*

30. Jefferson's Manual § XI, in H.R.Doc. No. 529, 89th Cong., 2d Sess. § 317 (1967).

31. The presiding officer makes "decisions on procedural matters that arise." W. Hoogestraat, Modern Parliamentary Practice 12 (1966); H. Davidson, Handbook on Parliamentary Procedure § 402 (2d ed. 1968).

32. Generally the procedure in committees follows that applicable to the principal body. 8 Cannon's Precedents §§ 2213, 2215 (1936). In the U.S. House of Representatives, its rules so provide. Rules of the House of Representatives, Rule 76(a), in H.R.Doc. No. 529, *supra* note 30, § 735. The rules applicable in the U.S. House of Representatives and the Senate are indicative of acceptable parliamentary practice. Procedural questions arising in the House of Representatives are decided by the Speaker by his ruling thereon, Rules of the House of Representatives, Rule 1, cl. 4, in H.R. Doc. No. 529, *supra*, § 624, and those arising in the Committee of the Whole are decided by the chairman. 5 Hind's Precedents § 6928 (1907) (*see* 4 Hind's Precedents § 4569 (1907)). Rulings by the speaker are "subject to an appeal by any member" and may thus be reexamined and reversed by the House. Rules of the House of Representatives, Rule 1, cl. 4, in H.R. Doc. No. 529, *supra*, §§ 624, 627–268. Jefferson's Manual makes the same point in that "[i]n Parliament, all decisions of the Speaker may be controlled by the House. 3 Grey, 319." Jefferson's Manual § 17, in H.R. Doc. No. 529, *supra*, § 379. If, during an investigation, a committee member objects to a question, the committee decides whether or not the question shall be put, 3 Hind's Precedents § 1775 (1907), but it takes an objection by a committee member to trigger the procedure of submitting the appeal to the full committee. Thus it is not every ruling by the chairman that is subjected to a vote. The practice in this respect follows general parliamentary practice in Congress, as the Congressional Record abundantly indicates, whereby so much is accomplished by unanimous consent. If every ruling required a vote of the entire committee present, hearings could be greatly delayed.

33. *See Who's Who in America (36th ed. 1970):* Carl Thomas Curtis, Karl Earl Mundt. Both Senators have served in the House of Representatives or the Senate continuously since 1939.

to be thoroughly familiar with the proper procedure to be followed in such cases. Had they any objection to the chairman's ruling, they would have asserted it and failing to do so, under the well established principles of parliamentary procedure, they are deemed to have assented to it. Moreover, the record of the hearing makes it clear that Senators Mundt and Curtis by their remarks at the time indicated their support of the chairman's ruling on appellant's request to cross examine witnesses.[34] We therefore conclude that appellant's contentions that he had the right to cross examine those who had allegedly defamed him, and to present evidence in his own behalf, are without merit to the extent that he asserted he possessed those rights in excess of the participation that had been allowed him by the rulings of the chairman.

Appellant also contends that the Subcommittee lacked authority to conduct the inquiry in question and that the questions to be asked appellant were not relevant to the inquiry, citing Watkins v. United States, *supra*. This contention must also fall. The enabling resolution authorized the Subcommittee to investigate "the efficiency and economy of operations of all branches of the Government," "syndicated or organized crime," "all other aspects of crime and lawlessness within the United States," and "riots, violent disturbances of the peace, vandalism, civil and criminal disorders." [35] The Chairman, in his statement opening the hearings, outlined the purpose and scope of the hearings as follows:

The Chairman. The Chair will make a brief opening statement.

Today the subcommittee begins an inquiry into a grant of Federal funds totaling $927,341 made on June 2, 1967, by the Office of Economic Opportunity to a Chicago civic organization for a program that was supposed to provide education and employment opportunities for members of two of that city's street gangs, the Blackstone Rangers and the East Side Disciples.

The grant was purportedly made to enable approximately 800 members of the two gangs to acquire basic educational skills in reading, writing, and arithmetic. There were also provisions for referring them to prospective employers after their schooling had been completed.

A program of this kind may sound worthy and laudable, particularly when its alleged objectives are to give members of a gang of youths an opportunity to choose an alternative to the lawlessness and violence which usually characterize the activities of city street gangs.

In the course of our inquiry into riots in Chicago, however, the subcommittee received a number of disturbing reports about serious improprieties related to this federally financed youth manpower program. It appears that supervision and control of its operations have been extremely inadequate, although we understand that from the beginning OEO designated this program as a "high risk" type of

34. *Hearings, supra* note 10, at 2546–2554. Additionally, when the chairman ruled on the motion by counsel for appellant to strike all prior testimony concerning Fort, because of a claimed denial to him of a right to confront or cross examine certain witnesses, his remarks indicated that he recognized his ruling could be upset by the Committee. At that time the chairman remarked, "The ruling of the Chair will be *if I am sustained,* that nothing we have received in the record thus far will be stricken from the rec-

ord." *Hearings, supra,* at 2546. This remark was a reminder to the other Senators, had they needed it, that his ruling could be reversed by them, if they so desired. All other rulings by the chairman were subject to the same right in the Members to upset the ruling and in the absence of any indication by the other Members that they contested them, the rulings stand by unanimous consent.

35. *See* note 5 *supra*.

activity. The subcommittee has been informed that the running of the program was actually turned over to the gang leaders and that the civic organization which received the grant from OEO exercised little or no authority over their activities. We are advised that the law enforcement officials of Chicago, who have been trying diligently to control and disband street gangs on Chicago's South Side strongly opposed the disbursement of Federal funds for this project because they believed that the primary result of such payments would be to strengthen and consolidate the gangs.

Information the subcommittee has received indicates that the funds expended for the program's specific goals may have been almost completely wasted. It has been reported that the Federal grant of almost $1 million, disbursed through the community group called the Woodlawn Organization, actually has been used as Chicago officials charged, to bolster and perpetuate the traditional structure of the two gangs and to furnish financial support to gang leaders and their followers rather than to educate gang members or provide them with jobs.

The subcommittee expects to hear testimony about the criminal records of the gang leaders and members who were employed as supervisors and teachers in the program's education centers. It has been reported that a very large percentage of these employees have been arrested and charged with serious crimes such as murder, rape, and strong-arm robbery since the grant was approved by OEO. One of the principal leaders of the Blackstone Rangers, Eugene Hairston, was convicted on May 29 of this year for soliciting a group of teenage gang members to murder three men. This crime occurred subsequent to the OEO grant. The evidence in the trial revealed that the young Blackstone Rangers were given $1 each and portions of cold meat, cheese, and orange juice as payment for committing the crime. At the time of the killing in June of 1967 Hairston was assistant project director of the OEO-funded program.

During these hearings, we will hear testimony from city officials of Chicago, from representatives of the Office of Economic Opportunity, and from members of the Woodlawn Organization.

We have called witnesses who are knowledgeable about the structure and operations of the gangs, particularly a young man who formerly held one of the top positions of leadership in the Blackstone Rangers.

(At this point Senator Javits entered the hearing room.)

The Chairman. The subcommittee will seek to determine the validity of an allegation that the Office of Economic Opportunity, in negotiating the conditions of the grant, in fact, made a deal with the leadership of the gangs to permit them to have firm control of the youth program and the sum of almost $1 million which financed it, in return for their promise to end the bloody warfare between the gangs.

We will attempt to ascertain whether any benefits were derived from this arrangement or whether the Chicago experiment resulted mainly in strengthening the gangs and actually increasing unlawful and criminal activities in the areas under their control. We want to know whether Federal funds were used as a payoff to the gangs to buy peace on the streets of Chicago's South Side.

The subcommittee is conducting this investigation pursuant to the authority granted in Senate Resolution 216,[36] 90th Congress, second session. In the

---

36. A typographical error in the original daily copy of the hearing transcript received by counsel for appellant from the court reporter stated that the authorizing resolution was "212" instead of "216." *See* pp. 684–685 *infra.*

normal functioning of the subcommittee, we have the duty and responsibility to inquire into waste and inefficiency in Government operations, organized crime, and improprieties in labor-management affairs. Additionally, since August 12, 1967, the Senate has authorized and directed the subcommittee to inquire into matters relating to urban riots and criminal activities and civil disorders.

The hearings which start today will be concerned in part with rioting and civil disorders and disturbances in the city of Chicago, and certain of the testimony will relate to matters of organized crime. *However, the Chair wishes to state that this investigation into the use of Federal funds for the benefit of two street gangs in Chicago is also being conducted under the authority given in Senate Resolution 216,*[37] *March 15, 1968, to "make investigations into the efficiency and economy of operations of all branches of the Government, including the possible existence of fraud, misfeasance, collusion, mismanagement, incompetence, corrupt or unethical practices, waste, extravagance, conflict of interest, and the improper expenditure of Government funds."* (Emphasis added.) [38]

■ Appellant Jeff Fort was vice president of the Blackstone Rangers and a "Center Chief" of the OEO-sponsored Woodlawn Project at a salary of $6,000 a year.[39] Immediately after appellant withdrew from the hearing, the members of the Subcommittee read into the record certain questions they were prepared to ask him concerning his authority and duties as a Center Chief and concerning his knowledge of any illegal activities undertaken by the Blackstone Rangers during the period of the grant.[40] We consider these questions were clearly pertinent to the inquiry [41] and that the inquiry itself was well within the author-

ity of Congress to undertake. *See* Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). Moreover, we hold that the question directed to appellant, "Where do you live, Jeff?" was pertinent to the subject matter of the investigation in that its answer would serve to further identify appellant. Positively establishing the identity of the witness as the Jeff Fort who lived in South Chicago, who was a member of the Blackstone Rangers and who was on the payroll as a Center Chief of the Woodlawn Project funded by the OEO was essential to the Subcommittee's investigation if his testimony was to have any pertinency to the subject matter of the investigation. The identity of a witness is an important fact in almost every investigation and so it was with Jeff Fort in this one so we conclude that the questions asked him were relevant to the investigation.

No question of pertinency was raised with respect to the conviction on the second count which charged that appellant "deliberately and intentionally * * declined and refused to answer any questions." It is hard to imagine any conduct that would be more contemptuous of the Congress than refusing for no justifiable reason to answer *any* questions. Under the circumstances here present we find such conduct to be a clear violation of the applicable contempt statute.

### III

■ Appellant next argues that he was denied a fair trial by virtue of the exclusion of certain evidence and by prosecutorial comment on certain matters not in evidence. Appellant sought to introduce the opening statement of the Subcommittee as transcribed in the daily copy that he had purchased on the grounds that it contained a typographical error and therefore did not give him adequate notice of the proceedings. The typographical error complained of was

---

37. *Id.*

38. *Hearings, supra* note 10, Part 9, at 1805–1807.

39. *Id.*, Part 12, at 2547.

40. *Id.*, Part 12, at 2550–2554.

41. Whether Fort could refuse to answer some questions on Fifth Amendment grounds would raise other problems.

the insertion of the incorrect authorizing resolution—Senate Resolution 212 rather than Senate Resolution 216. However, appellant's counsel had a complete copy of the opening statement of the chairman of the Subcommittee outlining the purpose of the hearing [42] and that statement was complete and gave adequate notice to all who could read as to the subject of the investigation. Such fact alone is sufficient to refute any claim of lack of adequate notice of committee purpose. Thus, the content of the chairman's opening statement was sufficient to place counsel and his client upon notice of the *particular purpose* (OEO Woodlawn Project) of the investigation.

Moreover, it was stipulated that appellant's counsel on July 1, 1968, eight days before the hearing, had in his possession a copy of the Rules of Procedure of the Senate Subcommittee which on the opening page contained a complete copy of Senate Resolution 216 and in the remaining pages set forth other applicable Senate Resolutions and the Rules of Procedure for the Investigations Subcommittee as adopted on January 22, 1968. This refutes any claim that appellant, through his counsel, did not have notice that the Subcommittee was authorized to act under the powers conferred by Senate Resolution 216. It was also stipulated that appellant's counsel purchased daily copies of the hearings from June 20, 1968 through October 11, 1968. The cover sheet on each daily transcript so delivered *correctly* referred to the authority for the hearing as being Senate Resolution 216 [43] and not "212."

It is also significant that the single typographical error of which appellant complains was not in any document served upon him by the Subcommittee but rather was contained in an advance copy of the hearings he obtained himself. As all know who deal with tran-

scribed testimony, errors frequently occur in daily copies. That some error had been made in referring to Senate Resolution 212 instead of 216 would have been apparent to any person who checked S. Res. 212 because that resolution referred to investigations of "national security and international operations" [44] which objects were remote from the purpose announced by the Subcommittee to investigate the Woodlawn expenditures of the OEO grant. The first paragraph of the letter dated July 1, 1968 of appellant's counsel to the Subcommittee also indicated that he knew the Subcommittee was investigating the "Woodlawn area job training project, Chicago, Illinois, funded by the Office of Economic Opportunity" and was familiar with the prior testimony and affidavits received by the Subcommittee with respect to Jeff Fort.

Finally, the chairman repeated the purpose of the investigation when appellant and his counsel were before the Subcommittee on July 9, 1968.[45] There is enough in all this to show that appellant personally and through his counsel had adequate notice and that he was not misled by the typographical error. *See* Sinclair v. United States, 279 U.S. 263, 296, 49 S.Ct. 268, 73 L.Ed. 692 (1929). Such error was legally insignificant.

■ Appellant also argues that the prosecutor in closing argument referred to certain documents not in evidence. However, the record makes it clear that the first challenged document—the opening statement of the chairman—was in fact admitted into evidence and read to the jury. (Tr. 121–126.) This was also contained in the printed volumes of the Subcommittee hearings which were admitted into evidence by stipulation of the parties. (Tr. 69.) The second challenged document was a stipulation of the

---

42. *See* text, *supra*, pages 678–679.

43. According to the stipulation, the cover sheet of each daily transcript stated:
    The Subcommittee met at  *  *  *  (time and date) in Room 3302, Senate Office Building, pursuant to Senate Resolution 216, agreed to March 15, 1968.

44. 114 Cong. Rec. 6707 (1968).

45. *Hearings, supra* note 10, at 2548.

parties to the effect that appellant's counsel had purchased a daily copy of the hearings from June 20 to October 11, 1968. (Tr. 211.) This fact had been stipulated to by the parties for the court's consideration and at the time it was admitted appellant's counsel stated "It may be at a subsequent point we may ask it be submitted to the jury. * * *" (Tr. 70.) The court permitted the prosecutor to refer to this stipulation in his argument to the jury only because it found that appellant's counsel had attempted to convey to the jury in closing argument the impression that his client was without any means of knowledge of the opening statement of the chairman. The court held that appellant's counsel by his argument had "opened the door up before the jury." We agree. His action was equivalent to admitting a fact stipulated for one purpose to be used for another purpose. Appellant's counsel admitted the correctness of the fact. (Tr. 213.) Under such circumstances we find the court's ruling to be within its allowable discretion as to the use of evidence.

Appellant finally challenges the action of the trial court, following the conviction of Fort, in remanding him to the custody of the Attorney General pursuant to 18 U.S.C. § 5010(e) [46] of the Youth Corrections Act [47] for examination to determine his suitability for commitment pursuant to that Act.[48] Appellant has not yet been sentenced. However, shortly after his conviction and remand for examination this court held that such order of commitment was a sufficiently final order so that an appeal could be taken from the underlying conviction. United States v. Fort, 133 U.S. App.D.C. 155, 409 F.2d 441 (1969). Under a subsequent order of this court, the appellant was released on bail pending appeal. Consequently the court's order that appellant be examined to determine his suitability for commitment under the Youth Corrections Act has not been carried out and we, of course, cannot predict the results of that observation nor what action the trial court will take based on the results of the observation. The court may or may not sentence appellant under the Youth Corrections Act, and because of this uncertainty the contention is made that raising the question now is premature and for that reason we should not now attempt to decide the issue. However, appellant has been convicted; and the court has ordered him committed to the custody of the Attorney General under 18 U.S.C. § 5010 (e) [49] for examination; and such order in his case is a preliminary requirement to his eventual sentencing under the Act; and he challenges the application of section 5010(e) to him. He also asserts that he cannot finally be sentenced under the Act but that additional question is not strictly before us. However, in passing on the proper application of section 5010(e), we might also, as a practical matter, decide the ultimate question. That we might do so should not deter us from answering the question that is before us involving the remand to the custody of the Attorney General for upwards of sixty days for observation and study to determine whether appellant may derive benefit from treatment under section 5010(b) or (c). Such question is to be answered by an interpretation of the Youth Corrections Act.

---

46. *See* note 14 *supra.*

47. *See* 18 U.S.C. § 5005 *et seq.* (1964).

48. In so doing the court stated:
I have analyzed the probation report and am of the opinion that this Court should commit the defendant under Section 5010(e) for an investigation which will result in determining whether he will derive benefit from commitment under the Federal Youth Corrections Act.

I would like to conclude by quoting a portion of the probation report which reads as follows:
"Punishment by confinement alone would probably be completely negative. Planning for long term rehabilitation is indicated and can best be commenced in an institutional setting where additional diagnostic and intensive counselling services can be attempted."

49. *See* note 14 *supra.*

The Act was adopted by Congress in 1950 in order "To provide a system for the treatment and rehabilitation of youth offenders, to improve the administration of criminal justice, and for other purposes." (64 Stat. 1085). The Act provides that a "'youth offender' means a person under the age of twenty-two years at the time of conviction." [50] And a "'committed youth offender' is one committed for treatment thereunder to the custody of the Attorney General pursuant to sections 5010(b) and 5010(c) of [said] chapter." [51] The two latter sections provide:

"If the court shall find that a convicted person is a youth offender, and the offense is punishable by imprisonment under applicable provisions of law other than this subsection, the court may, in lieu of the penalty of imprisonment otherwise provided by law, sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter until discharged by the Division as provided in section 5017(c) of this chapter." (Emphasis added.)

18 U.S.C. § 5010(b), 64 Stat. 1087.

"If the court shall find that the youth offender may not be able to derive maximum benefit from treatment by the Division prior to the expiration of six years from the date of conviction it may, in lieu of the penalty of imprisonment otherwise provided by law, sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter for any further period that may be authorized by law for the offense or offenses of which he stands convicted or until discharged by the Division as provided in section 5017 (d) of this chapter."

18 U.S.C. § 5010(c), 64 Stat. 1087.

It is thus clear that section 5010(b) states the basic requirements upon which coverage of the Act is determined. They are twofold. First, that the convicted person be a youth offender, i. e., under twenty-two at the time of conviction, and, secondly, that the offense of which he is convicted be *"punishable by imprisonment* under applicable provisions of law other than this subsection." (Emphasis added). Appellant contends that it was not the intent of Congress to apply the Act to persons convicted of misdemeanors; or to persons convicted of contempt because the very nature of a conviction for contempt was not one that required rehabilitation.

However, the standard prescribed by Congress as the basis for the application of the Act was not concerned with the nature of the offense but rather with the nature of the punishment possible under the act he was convicted of violating, i. e., whether it was *punishable by imprisonment*. We thus decide that a person convicted of contempt of Congress under a statute authorizing imprisonment for a year or less (a misdemeanor) may be committed to the custody of the Attorney General for observation and study under 18 U.S.C. § 5010(e). That a youth offender may eventually be sentenced under the Youth Corrections Act for an indeterminate period of treatment up to four years, plus possible supervision for an additional two years, does not alter the holding. All "youth offenders" are subject to the same treatment. If they respond properly they may be released sooner (§ 5017) and upon the unconditional discharge by the Youth Corrections Division of a committed youth offender before the expiration of the maximum sentence imposed upon him the conviction is automatically set aside.[52]

50. 18 U.S.C. § 5006(e), 64 Stat. 1086.

51. *Id.* § 5006(f).

52. 18 U.S.C. § 5021(a) and (b), 64 Stat. 1089, provides:

(a) Upon the unconditional discharge by the division of a committed youth offender before the expiration of the maximum sentence imposed upon him, the conviction shall be automatically set

Appellant also contends that the Youth Corrections Act should not be automatically applied just because a defendant is within the prescribed age limits and that appellant was entitled to an evidentiary hearing on whether "commitment prior to sentencing is contested." We see no evidence here that the Act was automatically applied but we do note that appellant on the face of the record apparently satisfied all the conditions precedent to qualifying initially for consideration as to whether he was eligible under the Youth Corrections Act.[53] Certainly every judge who sentences a youth offender should seriously consider whether the offender is eligible for treatment under the Youth Corrections Act. In most cases it is the preferred method of attempting to rehabilitate youth offenders. We find nothing wrong with the way the trial judge handled the commitment of appellant for examination.

■ With reference to the claim that appellant was entitled to an evidentiary hearing on such commitment, it may be now that we have ruled out some of the issues that appellant considered were involved, that his idea as to the necessity or magnitude of this hearing may somewhat dissipate. Of course, a convicted person is always entitled to a hearing if he makes a substantial claim in good faith that he is not a "convicted youth offender." However, the appellant here did have a hearing on precisely that point when he was committed. After ordering his commitment under section 5010(e) the trial judge inquired, "Do you have anything to say, counsel?" Counsel then proceeded to question whether section 5010(e) was applicable. He pointed to the offender's age as being over twenty-one, that the offense was a misdemeanor[54] and to the non-violent nature of the crime of contempt for which he was convicted. The United States Attorney then responded and finally the court informed counsel and appellant of certain matters reported in the probation report, namely: that following his conviction of contempt appellant was rearrested in Chicago on an old warrant and in effecting the arrest, a search of his premises disclosed an unregistered pistol and he was charged accordingly. The search also disclosed three 12-gauge shotguns, sixteen shotgun shells, sixteen .45 caliber bullets, one hundred thirty-four .30 caliber bullets, forty 9MM Luger bullets, and two pair of brass knuckles. Following this argument and disclosure the court rejected the arguments of appellant's counsel as to the proper interpretation of the statute and ordered appellant committed. We find nothing to criticize in the handling of this phase of the matter by the trial court.

We accordingly affirm the conviction and remand the case to the trial court to carry out the commitment under section 5010(e) and for eventual sentencing.

Affirmed.

aside and the division shall issue to the youth offender a certificate to that effect.

(b) Where a youth offender has been placed on probation by the court, the court may thereafter, in its discretion, unconditionally discharge such youth offender from probation prior to the expiration of the maximum period of probation theretofore fixed by the court, which discharge shall automatically set aside the conviction, and the court shall issue to the youth offender a certificate to that effect.

53. The Youth Corrections Act defines "youth offender" to mean "a person under the age of 22 years at the time of conviction," 18 U.S.C. § 5006(e), and "conviction" to mean "the judgment on a verdict or finding of guilty, a plea of guilty, or a plea of nolo contendere," 18 U.S.C. § 5006(h). The record indicates that Fort satisfied these requirements.

54. Carter v. United States, 113 U.S.App. D.C. 123, 125, 306 F.2d 283, 285 (1962) holds that sentences may be imposed under the Youth Corrections Act in misdemeanor cases. By its precise terms the Youth Corrections Act authorizes commitment thereunder if "the offense is punishable by imprisonment under applicable provisions of law other than" the Youth Corrections Act.