**UNITED STATES of America,**

v.

**Alan McSURELY, Appellant.**

**UNITED STATES of America,**

v.

**Margaret McSURELY, Appellant.**

**Nos. 24812, 24813.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 21, 1972.

Decided Dec. 20, 1972.

Mr. Morton Stavis, Newark, N. J., with whom Miss Nancy Stearns, Newark, N. J. (both appointed by this court), was on the brief, for appellants. Mr. Philip J. Hirschkop, Alexandria, Va., was also on the brief for appellants.

Messrs. John E. Drury, III, and Stephen W. Grafman, Asst. U. S. Attys., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before TAMM and WILKEY, Circuit Judges, and MATTHEWS,* U. S. Senior District Judge for the District of Columbia.

MATTHEWS, Senior District Judge:

On June 26, 1970, before a jury in the United States District Court for the District of Columbia, Alan and Margaret McSurely (husband and wife), the appellants herein, were each found guilty of two counts of contempt of Congress.[1] Imprisonment terms were imposed upon them. These convictions provide the basis for their appeals.

The alleged contempts of which appellants were convicted occurred before the Permanent Subcommittee on Investigations of the United States Senate Committee on Government Operation (hereinafter "the Subcommittee").[2] Subpoenas directing the appellants to testify before the Subcommittee, and to bring with them and produce certain records[3] were issued by the Subcommittee Chairman, Senator John L. McClellan of Arkansas. Appellants appeared before the Subcommittee on March 4, 1969, but refused to comply with the Chairman's demand for production of these documents. Chairman McClellan then advised the appellants that the subpoenas would remain in full force and effect and that appellants were ordered and directed to comply with the subpoenas by noon, Friday, March 7. Neither appellant appeared at any time after this March 4 hearing, nor were the subpoenaed documents produced as directed by the Chairman.

Subsequently, on March 24, 1969, the Subcommittee voted to seek contempt citations against appellants. The full Committee presented the matter to the Senate by resolution. This resolution was passed by the Senate on May 5, 1969,[4] and certified to the United States Attorney for the District of Columbia to proceed against appellants for their contempts. Indictments followed, and appellants were tried and convicted on June 26, 1970. Their appeals have been consolidated.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(c) (1970).

1. The pertinent statute, 2 U.S.C.A. § 192, states:

   "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

2. The Subcommittee, pursuant to its basic enabling resolutions, was continuing its investigation into the subject of riots, and civil and criminal disorders throughout the United States.

3. The records sought in the subpoenas included documents relating to certain meetings held in Nashville, Tennessee on April 5 through 8, 1967, prior to the civil disturbances which occurred in Nashville later that month; documents pertaining to appellants' membership, employment, or activities in five political action organizations, viz: Southern Conference Educational Fund; National Conference for New Politics; Vietnam Summer; Appalachian Volunteers; United Planning Organizations of Metropolitan Washington, D. C.; records and documents which relate to past and present membership in or employment by the Student Non-Violent Coordinating Committee; records and documents which relate to membership in and the activities of Students for a Democratic Society and/or Southern Students Organizing Committee. *Schedule A*, listing the documents subpoenaed by the Subcommitte, is reproduced in Defendants' Appendix, Vol. 2, p. 902.

4. 115 Cong.Rec. 11278 (1969).

This is yet another stage in a long and complex siege of litigation which began in Kentucky in August of 1967. From the time the Kentucky officials first seized their papers and personal property, appellants have protested the use thereof in every official action taken against them, asserting their Fourth Amendment rights and resisting what they believed to be official lawlessness. For more than three years the courts have had occasion to pass upon their claims, and appellants have been consistently sustained until their convictions for contempt (the subject of this appeal)..

Appellants base their appeal on a variety of reasons and reasoning. But the thrust of their appeal is upon the basic constitutional issue of unlawful search and seizure, not only by the Kentucky officials, but later by a United States Senate Subcommittee. It is their position that their refusal to comply with the Subcommittee subpoenas cannot support contempt convictions when the subpoenas themselves were based upon an unauthorized inspection by the Subcommittee investigator of documents which had been seized by state officials in Kentucky in violation of the Fourth Amendment and under an unconstitutional statute.[4a]

I

FACTUAL BACKGROUND

Alan and Margaret McSurely were field organizers for Southern Conference Educational Fund, Inc., in Pike County, Kentucky. Alan McSurely was also a field organizer for the National Conference of New Politics and had distributed literature of Vietnam Summer, both unincorporated associations. According to the McSurelys, their official duties were to investigate the socio-eco-political milieu of Pike County, to inform the people of their rights, and to help local citizens organize to overcome their problems.

The search and seizure challenged here was initiated under a section of the sedition statute of Kentucky, which reads:

"KRS 432.040—Any person who by word or writing advocates, suggests or teaches the duty, necessity, propriety or expediency of criminal syndicalism or sedition, or who prints, publishes, edits, issues or knowingly circulates, sells, distributes, publicly displays or has in his possession for the purpose of publication or circulation any written or printed matter in any form advocating, suggesting or teaching criminal syndicalism or sedition, or who organizes or helps to organize, or becomes a member of or voluntarily assembles with any society or assemblage of persons that teaches, advocates or suggests the doctrine of criminal syndicalism or sedition shall be confined in the penitentiary for not more than twenty-one years, or fined not more than ten thousand dollars, or both."

On August 11, 1967, acting under this statute and pursuant to an affidavit, a Pike County Judge issued a search warrant for the premises occupied by appellant Alan McSurely and a warrant for his arrest. That same night officials of Pike County and their deputies conducted a search of the McSurely residence;

---

**4a.** Appellants also raise questions as to whether the subpoenas were overly broad; whether appellants properly stated their objections to the Subcommittee; whether the subpoenas infringed upon appellants' First Amendment rights; whether the documents were pertinent to matters under inquiry by the Subcommittee; whether the authority of the Subcommittee embraced the subject matter about which inquiry was being made; whether appellants' alleged contemptuous conduct before the Subcommittee on March 4, 1969, was negated by the Subcommittee's granting of three additional days in which to comply with the subpoenas; whether inaction by appellants on March 7, 1969, constituted a second contempt; whether misrepresentations made by the prosecutor to the Grand Jury invalidated the indictments returned against appellants; and, finally, whether the Court at the contempt trial committed various errors alleged by appellants.

they seized and impounded 564 loose books, twenty-six posters, twenty-two boxes of books, pamphlets, and other private and published documents found in their home. "They also impounded a suitcase of clothes and several personal items which were caught up in the whirlwind of the search." [5] Both Alan and Margaret McSurely were arrested and charged with violation of the sedition statute.[6]

Following their arrest the McSurelys filed a complaint in the United States District Court for the Eastern District of Kentucky, challenging the constitutionality of the Kentucky sedition statute and requesting that the matter be heard by a three-judge court pursuant to 28 U.S.C. §§ 2281–84. On September 1, 1967, a three-judge district court was convened.

On September 11, the Grand Jury of Pike County returned an indictment against appellants charging them with seditious activities against the Commonwealth in violation of KRS 432.040. However on September 14, 1967, the three-judge court entered an order, one judge dissenting, declaring the Kentucky sedition statute unconstitutional and permanently enjoining the Commonwealth of Kentucky and the Pike Circuit Court from proceeding further with the prosecution of the McSurelys.[7]

In its order the court directed the Commonwealth Attorney for Pike County, one Ratliff, to continue to hold in *safekeeping* all materials seized from the McSurelys until final disposition of the case by appeal or otherwise. No appeal was ever filed.

Following the above court order, the Assistant Counsel for the aforesaid Senate Subcommittee telephoned Commonwealth Attorney Ratliff and inquired about the seized materials belonging to the McSurelys. Prior thereto Ratliff had publicly stated that he intended to make the seized materials available to Congressional committees. As a result of this telephone conversation between the Assistant Counsel and Ratliff, a Senate Subcommittee investigator went to Pikeville on several occasions in October, 1967 (prior to the expiration of the time for appeal from the judgment of the three-judge court), and visited Ratliff, inspected the seized materials, made notes therefrom, and was provided copies of 234 documents. Further, the investigator was allowed to take these copies with him to the Subcommittee's offices in Washington, D. C. At no time was there any attempt to contact

---

5. McSurely v. Ratliff, 282 F.Supp. 848, 850 (E.D.Ky.1967).

6. There was no warrant for the arrest of Margaret McSurely. The affidavit in support of the warrant does not mention her. Defendants' Appendix, Vol. 2, pp. 943, 945.

7. McSurely v. Ratliff, *supra* note 5. Circuit Judge Combs, who delivered the opinion of the three-judge court stated at page 849:
    "Kentucky's sedition law was passed in 1920 in the aftermath of World War I and the Bolshevik Revolution in Russia. The law was amended slightly in 1922, otherwise it has remained unchanged through the years. As would be expected, the statute is broad and comprehensive. It was good politics to be against Communism. The Governor signed the bill but was fearful that it drew too much water. He publicly stated that it

'goes far afield and far beyond syndicalism and sedition.' He thought the courts would 'take out of this law the sections which make it dangerous', and concluded with this statement: 'Those who seek its [government] overthrow by force or violence, or those who counsel resistance to its laws by unlawful means must be destroyed, but the right of free speech is the blood-bought heritage of every citizen: it is the palladium of our liberties, and it must and shall be preserved.' "
And at page 852, Judge Combs observed:
    "It is difficult to believe that capable lawyers could seriously contend that this statute is constitutional. * * * In addition, the conclusion is inescapable that the criminal prosecutions were instituted, at least in part, in order to stop [McSurelys'] organizing activities in Pike County."

the McSurelys, their counsel, or seek formal approval from the court permitting the investigator access to these materials.[8] Also, it is stipulated that the Subcommittee investigator was not only aware of the three-judge court order of September 14, but he, in fact, examined the file of the case on October 9, and requested the Clerk to mail a copy of said order and the Inventory of seized materials to him at his Washington office.[9]

Upon the investigator's return to Washington with the copies of appellants' documents, Senator McClellan, Subcommittee Chairman, determined that certain of the books, records, documents, correspondence and other papers belonging to appellants and in the possession of Commonwealth Attorney Ratliff would be of value to the Subcommittee investigation of the riots occurring in Nashville, Tennessee, in April, 1967. The contested subpoenas issued by the Subcommittee to the McSurelys were in fact the product of this inspection and search of the documents by the Subcommittee's investigator.[10] The initial subpoenas were signed by Chairman McClellan on October 16, 1967, served upon Ratliff on October 17, 1967, and upon appellants on October 19, 1967— the latter date being five days after the expiration of the time permitted by law for the Commonwealth to appeal the three-judge court order of September 14, 1967.

On the day appellants received the subpoenas, they filed a motion seeking a temporary restraining order to prohibit the Commonwealth Attorney from releasing the subpoenaed materials to the Subcommittee. Additionally, they filed a separate motion seeking an order directing the Commonwealth Attorney to return the seized materials. Between October 1967, and July 1968, there was substantial litigation involving the disposition of these documents, culminating in a decision rendered by the Sixth Circuit Court of Appeals.[11] The Sixth Circuit ruled that the District Court for the Eastern District of Kentucky erred in refusing to return to appellants their documents which were seized in aid of a prosecution under an unconstitutional statute, since the time for appeal had expired. However, the Court declined to render an advisory opinion as to whether the Subcommittee subpoenas were valid or violated constitutional rights of the McSurelys, stating: "These questions may be adjudicated under the appropriate procedure for challenging subpoenas of Congressional Committees."[12] Acting pursuant to the Sixth Circuit decision, the District Court directed Ratliff to return all of the seized materials to appellants at 2:00 p.m. on November 8, 1968. Immediately after these materials had been returned, the McSurelys were served with new subpoenas prepared by the Subcommittee. The new subpoenas (similar to the original ones) are those with which the McSurelys refused to comply before the Subcommittee and which form the basis for the contempt convictions.

8. Ratliff indicated that prior to granting the Subcommittee investigator permission to inspect the documents, he sought the permission of the judges on the three-judge panel. He failed to locate two of them, but contacted the third. Ratliff also acknowledged that he did not seek the approval of the United States Marshal for the district who was co-custodian for the seized materials. Defendants' Appendix, Vol. 1, pp. 406, 408. However, there is no evidence that Ratliff received any formal permission in the form of a court order authorizing inspection of the McSurelys' seized property by the Subcommittee investigator.

9. Defendants' Appendix, Vol. 2, p. 1032, Stipulation No. 10.

10. The government conceded for purposes of this case that, but for said seizure by the state officials, the Subcommittee and its members and agents would not have known of the existence of the documents and hence that the subpoenas directing their production before the Subcommittee would not have been issued. See *Finding of Fact* No. 3, Defendants' Appendix, Vol. 2, pp. 971–72.

11. McSurely v. Ratliff, 398 F.2d 817 (6th Cir. 1968).

12. *Id.* at 818.

With this background, we turn to the primary issues presented on this appeal.

## II

## THE PRIMARY ISSUES

First, the McSurelys argue the invalidity of the Kentucky search and seizure on two grounds: (1) because made under an invalid statute (the Kentucky sedition law); and (2) because the affidavit supporting the search warrant failed to state circumstances establishing probable cause, and the warrant did not particularly describe the things to be seized.

As to the *first* ground, the Government has specifically conceded that the original seizure of documents was made pursuant to a statute which subsequently was declared unconstitutional. As to the *second* ground, the Government has ignored the McSurelys' claim that the affidavit and warrant were insufficient and has made no argument whatsoever to support the validity of the affidavit and warrant. Instead, the Government has sought to divert the issue. Since the three-judge court held the Kentucky sedition statute to be unconstitutional *after* the search and seizure of the McSurely documents, the Government argues that the statute was presumptively constitutional at the time the search and seizure was made, and hence, that the search and seizure should not be made retroactively invalid. The fallacy of the Government's argument is that it *assumes* the validity of the search and seizure when made—a premise hotly contested by the McSurelys.

Clearly the question of the validity of the search and seizure must first be decided. If the Kentucky affidavit and warrant are invalid, as contended by the McSurelys, that would foreclose any question of "retroactivity" to be accorded the court decision holding the Kentucky sedition statute unconstitutional.

Next, the McSurelys argue that the information upon which the Subcommittee subpoenas are based stems from action taken by a Subcommittee investigator who, without a shadow of authority from anyone in a position to give it, examined and made copies of the McSurely documents which had been illegally seized in Kentucky, said investigator having full knowledge at the time that the statute under which these documents were seized had been declared unconstitutional; and therefore, that the Subcommittee subpoenas are the product of an invasion of their Fourth Amendment rights.

Finally, relying on Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L. Ed. 652 (1914), and Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), the McSurelys maintain that because the Subcommittee subpoenas are based upon information obtained by an invasion of their Fourth Amendment rights, the Government should have been barred at the contempt trial from using as evidence the Subcommittee subpoenas.

The Government has consistently maintained that there has been no invasion of the McSurelys' Fourth Amendment rights, either by the Kentucky officials or by the Subcommittee. But in any event, it argues that the cited cases relied upon by the McSurelys are inapplicable to the Subcommittee subpoenas.

We now begin our examination of the search and seizure by the Kentucky officials of the McSurely documents. As the Supreme Court has stated:

> "In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out." [13]

## III

## THE SEARCH AND SEIZURE

A. Sufficiency of the Affidavit in Support of the Warrant

13. Elkins v. United States, 364 U.S. 206, 223–224, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960).

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The affidavit [14] contains a full description of the location of the premises subject to the search.

The affidavit is of one James Compton, stating that he is a reputable citizen of Pike County, and that he has reasonable grounds to suspect and believe "that seditious printed matter and printing press or other machinery to print and circulate seditious matter is being kept on the premises of Alan McSurely." He states the grounds for his belief or information to be that "[o]n August 4, 1967 he was informed by James Madison Compton, a reputable citizen of Pike County, Kentucky, that on said August 4, 1967, at approximately 12:00 noon, that the said James Madison Compton did observe certain seditious materials, being pamphlets, films, pictures and articles or equipment used in the teaching of sedition and printing and circulating seditious matter at or on the above described premises * * *."

■ The Fourth Amendment's proscriptions are enforced against the States through the Fourteenth Amendment, and the standard of reasonableness is the same under the Fourth and Fourteenth Amendments. Ker v. California, 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

■ An officer may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor from *facts or circumstances* presented to him under oath or affirmation. Mere affirmance of belief or suspicion is not enough. Nathanson v. United States, 290 U.S. 41, 47, 54 S.Ct. 11, 78 L.Ed. 159 (1933).

The purpose of the affidavit is to enable the magistrate to determine whether the "probable cause" required to support a warrant exists. The magistrate must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion. Giordenello v. United States, 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

■ When an affidavit is based on "hearsay" information, the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the "suspect" was engaged in illegal conduct, and some of the underlying circumstances from which the affiant concluded that the informant was "credible" and his information "reliable." Otherwise, the inferences from the facts which lead to the complaint will be drawn, not by a neutral and detached magistrate as the Constitution requires, but instead by a police officer who is in the business of ferreting out crime. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). In *Aguilar*, the affidavit stated:

"Affiants have received reliable information from a credible person and do believe that heroin * * * and other narcotics * * * are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law." 378 U.S. at 109, 84 S.Ct. at 1511.

The Court found the vice in this affidavit to be that the mere conclusion that petitioner possessed narcotics was not even that of the affiant himself; it was that of an unidentified informant. The affidavit contained no affirmative allegation that affiant spoke with personal knowledge of the matters contained therein. For all that appeared, the

---

14. The affidavit is set out in full in Defendants' Appendix, Vol. 2, p. 945.

source merely suspected, believed, or concluded that narcotics were in petitioner's possession. The magistrate could not judge from this information alone that an adequate showing of probable cause existed. The application failed to set forth any of the underlying circumstances necessary to enable the magistrate to independently judge the informant's conclusions. The affiant did not attempt in any way to support the claim of the informer's reliability and reputation for truthfulness except for the bald conclusion that he was "credible" and his information was "reliable."

■ Testing the Compton affidavit here against the foregoing guidelines, we observe, first, that the magistrate had before him the sworn statement of "James Compton", who merely states that he is "a reputable citizen of Pike County." There is nothing to indicate his capacity in the investigation of the McSurelys. While the veracity of an affidavit is not questioned when the affiant is one of the investigating police officers,[15] this is not necessarily true of someone who simply asserts that he is a reputable citizen of the County. Next, the affiant states that he suspects and believes that "seditious" matter is being kept on the premises of Alan McSurely. This much, standing alone, is insufficient under the teachings of *Nathanson*.

■ Add to this the affiant's statement that he bases his "suspicion and belief", not on his own observations, but on information received from another party, whom he states to be a "reputable citizen." This is precisely the type of conclusional statement which the *Aguilar* Court found inadequate, and from whence came the rule that when hearsay information is involved, the affiant must state some of the underlying circumstances from which he concluded that

the informant was "credible" and his information "reliable." In Spinelli v. United States,[16] the Court said that "[t]hough the affiant [an FBI officer] swore that his confidant was 'reliable,' he offered the magistrate no reason in support of this conclusion." The same deficiency obtains here. The affidavit does not meet the standards of either *Aguilar* or *Spinelli*.

■ Second, there is an additional reason for finding the affidavit insufficent. The Kentucky sedition statute, *supra*, from whence this search and seizure sprang, made it a criminal offense merely to possess, with intent to circulate, literature on the subject of "sedition." One definition of "sedition" found in the 1920 Act is "the advocacy or suggestion by word, act, deed or writing * * * of the *change* or *modification* of the Government of the United States or of the Commonwealth of Kentucky, or of the Constitution or laws of either of them, * * * *by means other than by lawful means* * * *."[17] (Emphasis added.) This definition would at least purport to guide a magistrate in determining *what constitutes* "seditious materials", the possession of which was an essential element of the crime. But affiant herein speaks only of "seditious" materials. His informant speaks only of "seditious" materials. Even assuming arguendo the validity of the Kentucky sedition statute[18] how could a "neutral and detached" magistrate glean from the contents of the affidavit that the pamphlets, films, pictures and articles observed by the informant on McSurely's premises were, by definition, "seditious"; or that the articles and equipment which informant saw were such as are used in the teaching of "sedition" and the printing and circulating of "seditious" matter? There is nothing in the affidavit whereby the

---

15. United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)..

16. 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969).

17. Carroll's Kentucky Statutes, Baldwin's 1936 Revision.

18. The statute was held unconstitutional in McSurely v. Ratliff, *supra* note 5.

magistrate can make *his own independent decision* as to whether these papers and equipment are "seditious" and in violation of law. Further, there is nothing in the affidavit whereby the magistrate can determine what the informant considered to be "seditious" materials. The magistrate was left to accept the naked conclusion of the informant that the materials viewed were "seditious." He became then nothing more than the "rubber stamp for the police", which was condemned in *Ventresca, supra.*[19]

In Keyishian v. Board of Regents,[20] the Supreme Court struck down a New York statute as unconstitutionally vague, which, without defining the words "treasonable or seditious" made "treasonable or seditious" utterances or acts grounds for dismissal from the public school system. Even by equating "sedition" with "criminal anarchy" defined in the New York Penal Law § 160 as the "doctrine that organized government should be overthrown by force or violence, * * * or by any unlawful means" this still left the crucial question of where the line was drawn between "seditious" and nonseditious utterances or acts. The Court concluded that the statute was of the "quality of 'extraordinary ambiguity,'" was "lacking in 'terms susceptible of objective measurement'", and that "[m]en of common intelligence must necessarily guess at its meaning and differ as to its application."[21] The ambiguity, the lack of an objective measurement standard, the guess work at meaning by equally competent persons with differing conclusions could not be exemplified more clearly than the allegedly "seditious materials" referred to in the affidavit before us.

For the reasons stated, we find that the affidavit falls short of minimum constitutional standards, and is insufficient to support a finding of probable cause.

**B. The Warrant.**

The Fourth Amendment not only prohibits the issuing of warrants except upon probable cause (here, probable cause that the McSurelys had in their possession with intent to circulate "seditious materials"), but it requires that said warrant particularly describe the "things to be seized." In Go-Bart Co. v. United States,[22] the Supreme Court said at page 357, 51 S.Ct. at page 158:

"This prevents the issue of warrants on loose, vague or doubtful bases of fact. It emphasizes the purpose to protect against all general searches. Since before the creation of our government, such searches have been deemed obnoxious to fundamental principles of liberty. They are denounced in the constitutions or statutes of every State in the Union."

The warrant before us directs the "searchers" to seize "seditious matter or printing press or other machinery to print or circulate seditious matter."[23] Perhaps due, at least in part, to the vagueness of the term "seditious matter" used in the warrant, it is nonetheless readily apparent that pursuant thereto a general search was made. The purported "seditious materials" seized, voluminous enough to fill one-third of a jail cell,[24] included the personal clothing of Mrs. McSurely, boxes of office supplies, cancelled checks, unused checkbooks, college examination and review notes, the McSurely's personal love letters, and their marriage certificate. One box contained 104 copies of Handbill Literature, *all* of which was published by the Commonwealth of Kentucky. There were 564 loose books impounded, which included "Tricks and Train-

---

19. Note 15, 380 U.S. at 109, 85 S.Ct. 741.

20. 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed. 2d 629 (1967).

21. *Id.* at 604, 87 S.Ct. at 684.

22. 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931).

23. The "warrant" is reproduced in Defendants' Appendix, Vol. 2, p. 943.

24. The inventory of materials seized and impounded by the Kentucky State Officials is found in Defendants' Appendix, Vol. 2, pp. 946–60.

ing for Cats", several books of poetry, one of which was "Poetry and Prose" by William Cullen Bryant, and the "Washington Yellow Page Telephone Directory." In essence, the McSurely home was ransacked and appellants were cleaned out of all their papers and books. No "printing press or other machinery to print or circulate seditious matter" is listed on the inventory of things seized.

The above facts are remarkably comparable to those in Stanford v. Texas.[25] In *Stanford* a local magistrate issued a warrant pursuant to § 9 of Art. 6889–3A of the Vernon's Ann. Revised Civil Statutes of Texas, known as the Supression Act, which authorizes the issuance of a warrant "for the purpose of searching for and seizing any books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings, or any written instruments showing that a person or organization is violating or has violated any provision of this Act." [25a] The act is a many-faceted law which, among other things, outlaws the Communist Party and creates various individual criminal offenses for Communist activity. The warrant specifically described the premises to be searched, stated affiants' belief that the premises contained "books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments *concerning* the Communist Party of Texas" [25b] which were unlawfully possessed in violation of law, and ordered the executing officers "to enter immediately and search the above described premises for such items listed above unlawfully possessed in violation of Article 6889–3 and Article 6889–3A, Revised Civil Statutes, State of Texas, and to take possession of same." [26]

The officers proceeded to the described premises,[27] and spent some four hours collecting about half the books in the house. While most of the books seized were stock from petitioner's business, the officers also took a number of books from his personal library.

"The books and pamphlets taken comprised approximately 300 separate titles, in addition to numerous issues of several different periodicals. Among the books taken were works by such diverse writers as Karl Marx, Jean Paul Sartre, Theodore Draper, Fidel Castro, Earl Browder, Pope John XXIII, and Mr. Justice Hugo L. Black. The officers also took possession of many of the petitioner's private documents and papers, including his marriage certificate, his insurance policies, his household bills and receipts, and files of his personal correspondence. All this material was packed into 14 cartons and hauled off to an investigator's office in the county courthouse. The officers did not find any 'records of the Communist Party' or any 'party lists and dues payments.' " [28]

In a motion seeking the annulment of the warrant and the return of his property, petitioner attacked the "search and seizure" on a number of grounds, among which were that the statutes were unconstitutional, that federal law had preempted state law, that the warrant did not sufficiently specify the offense, that the warrant was not issued upon probable cause. Without pausing to assess the substantiality of these grounds, the Court rested its decision upon just one ground, saying "we think it is clear that this warrant was of a kind which it was the purpose of the Fourth Amendment to forbid—a general warrant." [29] Speaking to the Fourth Amendment's mandate

---

25. 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

25a. *Id.* at 477, 85 S.Ct. at 507.

25b. *Id.* at 477–478, 85 S.Ct. at 508.

26. *Id.* at 479, 85 S.Ct. at 508.

27. The "described premises" were where petitioner resided and carried on a licensed mail order book business under the name of "ALL POINTS OF VIEW." *Id.*

28. *Id.* at 479–480, 85 S.Ct. at 509.

29. *Id.* at 480, 85 S.Ct. at 509.

that the warrant particularly describe the things to be seized, the Court said:

> "These words are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant." [30]

The Court said that what the history of the Fourth Amendment indispensably teaches is "that the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain. (Citations omitted.) No less a standard could be faithful to First Amendment freedoms. The constitutional impossibility of leaving the protection of those freedoms to the whim of the officers charged with executing the warrant is dramatically underscored by what the officers saw fit to seize under the warrant in this case." [31]

Reflecting on the history of the Fourth Amendment, the Court summarized the landmark case of Entick v. Carrington.[32] "John Entick was the author of a publication called Monitor or British Freeholder. A warrant was issued specifically naming him and that publication, and authorizing his arrest for seditious libel and the seizure of his 'books and papers.' The King's messengers executing the warrant ransacked Entick's home for four hours and carted away quantities of his books and papers. In an opinion which this Court has characterized as a wellspring of the rights now protected by the Fourth Amendment,[33] Lord Camden declared the

warrant to be unlawful. 'This power,' he said, 'so assumed by the secretary of state is an execution upon all the party's papers, in the first instance. His house is rifled; his most valuable secrets are taken out of his possession, before the paper for which he is charged is found to be criminal by any competent jurisdiction, and before he is convicted either of writing, publishing, or being concerned in the paper.' " [34]

"The requirement that warrants shall particularly describe the things to be seized makes *general searches* under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." (Emphasis added.) Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927).

The warrant in the present case, which authorized the seizure of "seditious matter or printing press or other machinery to print or circulate seditious matter" is so vague and broad as to be the very antithesis of the "particularity" required by the Fourth Amendment and the teachings of the above authorities. That a general search was made under authority of this warrant is here, as it was in *Stanford*, "dramatically underscored by what the officers saw fit to seize" under it.[35] Having been ordered to seize "seditious matter" the officers seized and impounded 564 loose books, twenty-six posters, twenty-two boxes containing books, pamphlets and other private and published documents, a suitcase of clothes and other personal items of the McSurelys, whom they arrested.[36]

Summing up in the *Stanford* opinion, the Supreme Court said:

> "Two centuries have passed since the historic decision in Entick v. Carring-

---

30. *Id.* at 481, 85 S.Ct. at 509.

31. *Id.* at 485, 85 S.Ct. at 511.

32. 19 How.St.Tr. 1029 (1765).

33. Boyd v. United States, 116 U.S. 616, 626–627, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

34. 379 U.S. at 483–484, 85 S.Ct. at 511.

35. Stanford v. Texas, *supra* note 25, 379 U.S. 485, 85 S.Ct. 512.

36. See pages 1181, 1182 *supra*.

ton, almost to the very day. The world has greatly changed, and the voice of nonconformity now sometimes speaks a tongue which Lord Camden might find hard to understand. But the Fourth and Fourteenth Amendments guarantee to John Stanford that no official of the State shall ransack his home and seize his books and papers under the unbridled authority of a general warrant—no less than the law 200 years ago shielded John Entick from the messengers of the King." [37]

The same guarantee shields Alan and Margaret McSurely from the unlawful search and seizure of the Kentucky officials.

█ It is our conclusion that the warrant did not particularly describe the "things" to be seized, and in its execution by the Kentucky officials as a "general" warrant, resulted in a flagrant abuse of appellants' constitutional right to be protected in their home from unreasonable searches and seizures. In the trial of the McSurelys for contempt the District Court clearly erred in concluding that the Kentucky search and seizure was lawful.[38]

In light of this conclusion, we now turn to the contempt convictions.

## IV

## THE CONTEMPT CONVICTIONS

The trial court's "FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANTS' SUPPLEMENTAL MOTION TO DISMISS INDICTMENTS" include the following Finding of Fact:

"Although it previously took a contrary position, the government has now conceded for purposes of this case that, but for said seizure by the state officials, the subcommittee and its members and agents would not have known of the existence of the documents and hence that the subpoenas directing their production before the subcommittee would not have been issued." [38a]

It is appellants' position that their refusal to produce the documents demanded in subpoenas issued by the Subcommittee will not support a contempt of Congress conviction, where, as here, all of the Subcommittee's knowledge pertaining to the existence of the subpoenaed documents, as well as the content thereof, was the fruit of an unconstitutional search and seizure conducted by state officials.

As previously stated [39] the day after the raid on the McSurelys, Commonwealth Attorney Ratliff announced publicly that Congressional Committees could have access to the seized materials.

On September 14, 1967, a three-judge federal district court entered an order holding unconstitutional the Kentucky statute under which the state criminal proceeding against the McSurelys was based, and declaring the statute

"upon its face overbroad, so vague and of such sweeping application as to run afoul of the provisions of the United States Constitution, which requires narrow and specific regulation in the field of protected activity." [40]

That court further found that under the circumstances presented, the decision in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) was

---

37. Stanford v. Texas, *supra* note 25, 379 U.S. 486, 85 S.Ct. 512.

38. Holding as we do that the search and seizure by the Kentucky officials was unconstitutional for the reasons stated, we need not express an opinion as to whether a search warrant issued and executed pursuant to a statute subsequently declared to be unconstitutional is retroactively invalid.

38a. Defendants' Appendix, Vol. 2, pp. 971–972, No. 3.

39. The events following the McSurelys' arrest are fully set forth *supra* at pages 1182 through 1184. We summarize them here for clarity.

40. The court's order of September 14, 1967 is found in Defendants' Appendix, Vol. 2, pp. 961–962.

applicable, and enjoined Kentucky, its courts, and officials from taking any further action or proceeding against the McSurelys under the sedition statute. The court further ordered

> "that all books, papers, documents and other material now in the custody of the Commonwealth Attorney of Pike County, Ratcliff, reflected by the Inventory filed in this action continue to be held by him in safekeeping until final disposition of this case by appeal or otherwise." [41]

Following the above-mentioned court order, Lavern Duffy, Assistant Counsel for the Subcommittee, telephoned Mr. Ratliff and asked if he had the seized materials.

Thereafter on several occasions in October 1967, and prior to the expiration of the time for appeal from the judgment of the three-judge court, John Brick, investigator for the Subcommittee visited Mr. Ratliff, Commonwealth Attorney, who was holding the seized materials for "safekeeping" pursuant to the above-mentioned court order. Without getting authority from anyone for so doing, Mr. Ratliff gave the Subcommittee investigator access to the seized materials. A locked door was opened for the investigator. He entered and inspected the documents, made notes therefrom and received xeroxed copies

of some of them from one of Mr. Ratliff's subordinates. Furthermore, the investigator was allowed to take back to his offices in Washington, D. C., over two hundred of these documents.[41a]

"Unjustified search and seizure violates the Fourth Amendment, whatever the character of the paper; whether the paper when taken by the federal officers was in the home, in an office, or elsewhere; whether the taking was effected by force, by fraud, or in the orderly process of a court's procedure."[42]

Since the uninvited ear is a "search and seizure" within the ambit of the Fourth Amendment,[43] surely the uninvited eye of the Subcommittee's investigator is likewise a "search and seizure."

■ From the facts, the conclusion is inescapable that the subpoenas issued by the Subcommittee for the production of the McSurely documents were the product of the unauthorized inspection and search of the documents by an agent of the Subcommittee itself. However, the trial court reached a different conclusion.

■ In summary the trial court held that the state officials, having lawful custody of the seized documents, lawfully gave the Subcommittee's investigator permission to inspect and search them and to transport them all the way to the Subcommittee's offices in Washington.[44]

41. *Id.*

41a. Testimony of Investigator Brick, Defendants' Appendix, Vol. 2, pp. 726–741.

42. Olmstead v. United States, 277 U.S. 438, 477–478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (dissenting opinion of Brandeis, J.) (1928).

43. Alderman v. United States, 394 U.S. 165, 171, 203, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

44. The text of the court's holding is as follows:
> 1. The seizure of defendants' documents by the state officials incident to their arrest for violation of the state sedition statute was lawful at the time that [it] occurred and was not made retroactively unlawful by the subsequent decision of the district court

> [holding the sedition statute unconstitutional and] enjoining prosecution of defendants for violation of said statute.
> *  *  *  *  *
> 2. The state officials therefore had lawful and valid custody of the documents until such time as they returned them to defendants pursuant to the direction of the Court of Appeals. Having lawful and valid custody, the permission which they granted to agents of the subcommittee to inspect the documents was lawful.
> 3. Even if the seizure by the state officials were made retroactively unlawful by the decision of the district court, that fact would not afford defendants justification for refusing to comply with the subcommittee subpoenas. The "exclusionary rule" forbids the use of unlawfully seized items only as evidence

That activity might more appropriately be described (1) as an unconstitutional exercise of power by the Commonwealth attorney, Ratliff, and his subordinates at a time when Ratliff had *no* right whatever in and to these papers except to hold them in safekeeping (pending appeal) pursuant to the order of the three-judge court; and (2) as an unlawful encroachment by the Subcommittee investigator himself upon the rights of the McSurelys under the Fourth Amendment. Not only was the search and seizure of appellants' property by the Commonwealth officials illegal, but the subsequent search and use of that property by the Subcommittee investigator, with the cooperation of the Commonwealth attorney, violated appellants' constitutional right to have their property safe and secure from unwarranted inspections. Thus, the framing by the Subcommittee of the subpoenas relied upon here for conviction of the McSurelys was based upon information derived from unconstitutional searches, both by state officials and by the Subcommittee's investigator.

■ The trial court seems to have taken the position that whether or not the information concerning the documents subpoenaed was obtained by unconstitutional means, the "exclusionary rule", which forbids the use of unlawfully seized items as evidence against the victim of the seizure, applies only to criminal prosecutions and, hence, is not applicable to legislative subpoenas.

There is nothing in logic nor in the history of the "exclusionary rule" to support its inapplicability to legislative subpoenas framed upon information derived by the Government through a previous unconstitutional search. As Mr. Justice Brandeis has written:

"The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment."[45]

The "exclusionary rule" has its roots in Weeks v. United States.[46] There the Supreme Court ruled that evidence obtained as a result of an illegal arrest, search or seizure, conducted by or participated in by federal authorities, was inadmissible in any federal court. The Court said:

"The effect of the Fourth Amendment is to put the courts of the United

against the victim of the seizure in a criminal prosecution. * * * A legislative hearing is not a criminal prosecution, and items subpoenaed by a legislative committee are not sought as "evidence" to be used "against" the person to whom the subpoena is directed. None of the functions which the "exclusionary rule" is invoked to serve * * * would be enhanced by making the rule applicable to legislative subpoenas.

4. The fact that the subcommittee learned of the existence of the subpoenaed documents as a result of the seizure by the state officials neither invalidates the subpoenas nor provides in

any way a defense to these indictments charging defendants with contempt of Congress because of their refusal to comply with the subpoenas. The subpoenas are therefore valid and admissible in evidence in this case insofar as they have been challenged on Fourth Amendment grounds based upon the prior seizure of the documents by state officials.
Defendants' Appendix, Vol. 2, pp. 974–975.

45. Olmstead v. United States, *supra* note 42, 277 U.S. 478, 48 S.Ct. 572.

46. 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. *This protection reaches all alike, whether accused of crime or not,* and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws." [47] (Emphasis supplied.)

"The striking outcome of the *Weeks* case and those which followed it was the sweeping declaration that the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction, if obtained by government officers through a violation of the Amendment." [48] In Mapp v. Ohio,[49] the Supreme Court said that without an "exclusionary rule" the Fourth Amendment would be merely a form of words, valueless as a freedom against unreasonable invasions upon personal privacy, and it held that the "exclusionary rule" was an integral part of the Fourteenth Amendment as well as the Fourth Amendment, making it binding on all of the states.

The purpose of the "exclusionary rule" is "to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." [50]

The Supreme Court has recognized that the Constitutional requirement against unreasonable searches and seizures applies to Congressional hearings. In Watkins v. United States,[51] the Court said:

"It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation. *This, of course, assumes that the constitutional rights of witnesses will be respected by the Congress as they are in a court of justice. The Bill of Rights is applicable to investigations as to all forms of governmental action. Witnesses cannot be compelled to give evidence against themselves. They cannot be subjected to unreasonable search and seizure. Nor can the First Amendment freedoms of speech, press, religion, or political belief and association be abridged.*" (Emphasis supplied.)[52]

We have taken the language of *Watkins* to mean that "the consequences of the denial of these rights are no less severe merely because their denial is brought about by a congressional subcommittee. For example, an unreasonable search and seizure is no less illegal if conducted pursuant to a subpoena of a congression-

---

47. *Id.* at 391–392, 34 S.Ct. at 344.

48. Olmstead v. United States, *supra* note 42, 277 U.S. 462, 48 S.Ct. 567.

49. 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961).

50. Elkins v. United States, *supra* note 13, 364 U.S. 217, 80 S.Ct. 1444, 4 L.Ed.2d 669. Recently the Supreme Court held in Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), that a complaint stated a federal cause of action under the Fourth Amendment for damages for injuries allegedly resulting to the plaintiff

from the federal agents' violation of that Amendment. The Chief Justice dissented as to the "judicially created" damage remedy. Although he does "not question the need for some remedy to give meaning and teeth to the constitutional guarantees against unlawful conduct by government officials," he "would hesitate to abandon [the exclusionary rule] until some meaningful substitute is developed * * *." 403 U.S. 415, 91 S.Ct. 2014.

51. 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed. 2d 1273 (1957).

52. *Id.* at 187–188, 77 S.Ct. at 1179.

al subcommittee than if conducted by a law enforcement official."[53]

In Silverthorne Lumber Co. v. United States,[54] the Supreme Court held that the Fourth Amendment protects a party from compulsory production of papers when the information upon which the subpoenas were framed was derived by the Government through a previous unconstitutional search. The Court said:

> "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all."[55]

## CONCLUSION

■■ The contempt trial of the McSurelys was a criminal proceeding. The basis of their convictions rested upon the Subcommittee's subpoenas. The information upon which the Subcommittee subpoenas were framed was derived by the Subcommittee through a previous unconstitutional search and seizure by the Kentucky officials and the Subcommittee's own investigator. We hold that the "exclusionary rule" applies to these subpoenas and that it was error for the District Court to receive them in evidence at the trial.

The judgments of conviction of the McSurelys are reversed and the case is remanded to the District Court with instruction to enter judgments of acquittal.

Reversed and remanded.

53. United States v. Fort, 143 U.S.App. D.C. 255, 263, 443 F.2d 670, 678 (1970).

54. 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

55. *Id.* at 392, 40 S.Ct. at 183. Although this rather expansive language of *Silverthorne* has not been universally applied, it appears that the instances where the courts have deviated from it involve proceedings either prior or subsequent to the trial, and not the trial itself. See United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966) (illegally seized evidence presented to the grand jury; indictment upheld); Lawn v. United States, 355 U.S. 339, 78 S.Ct.

WILKEY, Circuit Judge, concurring:

While I concur in the result, and vote to reverse the McSurelys' convictions, I disagree strongly with the majority's formulation of this case and so feel compelled to set forth my own views.

## I. *Relevance of the Exclusionary Rule to the Proceeding Here*

### A. *Subpoena or Knowledge*

At the outset, let us be clear that what the appellants urge upon this court is indeed a novel formulation of the "exclusionary rule." It is necessary to state and develop why this is so, because it appears that the novelty of the theory upon which reversal is ordered is not recognized in the majority opinion, which concludes: "We hold that the 'exclusionary rule' applies to these subpoenas and that it was error for the District Court to receive them in evidence at the trial" (p. 1194). So the items of evidence which are relevant to the contempt convictions, and which we are urged to suppress, are the *subpoenas* themselves, *not* the *documents* which the subpoenas demand and which were illegally seized in Pike County, Kentucky, by state and local officials.

I agree that this state police search and seizure was illegal. It would follow that any documents so seized could be excluded in subsequent criminal proceedings against the McSurelys. However, the subpoenas themselves were never illegally sought or taken. They may not

311, 2 L.Ed.2d 321 (1958) (possibility of illegally seized evidence before grand jury; indictment upheld); Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (hearsay evidence presented to grand jury; indictment upheld); United States v. Schipani, 435 F.2d 26 (2d Cir. 1970) (proper for a trial judge in deciding upon sentence to consider evidence excluded from trial on Fourth Amendment grounds); and United States ex rel. Sperling v. Fitzpatrick, 426 F.2d 1161 (2d Cir. 1970) (proper for parole board to consider evidence at subsequent revocation hearing seized from parole violator pursuant to unlawful search).

be "excluded" under the traditional formulation of the exclusionary rule.

Two examples suffice to illustrate both the novelty and the confusion inherent in the appellants' formulation of the exclusionary rule as applied to the subpoenas, which the majority opinion accepts as the decisive issue. The opinion at one point states, "The trial court seems to have taken the position that . . . the 'exclusionary rule', *which forbids the use of unlawfully seized items of evidence* against the victim of the seizure, applies only to criminal prosecutions and, hence, is not applicable to legislative subpoenas" (p. 1192). And at another point, in quoting Olmstead v. United States,[1] "The striking outcome of the *Weeks* case . . . was . . . the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really *forbade its introduction, if obtained by government officers through a violation* of the Amendment" (p. 1193). It is readily apparent that the *subpoenas*, the only evidence relevant to the contempt conviction which the appellants ask us to suppress, were never *seized* from the defendants or anyone else. Nor did government officers *obtain* these subpoenas through any violation of anyone's Fourth Amendment rights; they no doubt were dutifully typed by Subcommittee staff stenographers, purely the product of and originally the property of the Subcommittee.

Of course, it can immediately be said that the *content* of the subpoenas, *i. e.* the list of documents belonging to the McSurelys, was derived from the illegal state search and seizure. True, but is what should be suppressed here the *knowledge* or use of the knowledge, which the Subcommittee acquired? If so, the court opinion should clearly so state, and then face up to the available justifications and consequences of such an extraordinary holding.

But, yet, the appellants only argued this obliquely, and this cannot be what

the majority intends. For (1) the holding is squarely that it is the subpoenas which should be suppressed, and (2) the majority opinion tells us that the Subcommittee had ample *knowledge* of the McSurelys' activities without these subpoenas, as the Subcommittee investigator talked to the state official on the phone, visited him, "inspected the seized materials, made notes therefrom and was provided copies of 234 documents. Further, the investigator was allowed to take these copies with him to the Subcommittee's office in Washington, D. C." (p. 1182). I suggest that the McSurelys' Fourth Amendment rights were just as effectively violated before the subpoenas were issued, and there is no way the "exclusionary rule" could operate to bar this knowledge so derived from the Subcommittee's ken. Nor would the purpose of the exclusionary rule be served, for the majority opinion reminds that the Supreme Court has told us "[t]he purpose of the 'exclusionary rule' is 'to prevent, not to repair. Its purpose is to deter . . .'" (p. 1193).

It thus begins to appear from this analysis that what we have here is not an exclusionary rule case at all, certainly not according to any previously accepted meaning. The complete inappropriateness of applying the exclusionary rule to a Congressional subpoena, as an item of evidence to be suppressed, is only the first of several reasons why the exclusionary rule does not apply here.

I suggest that the appellants have really argued for an exclusionary rule applicable to an evidentiary situation in a hearing before a Congressional committee, which might someday occur, but which did not occur in this case. If the McSurelys had complied with the subpoena, tendered the documents called for, and then at the stage when the documents were being placed in the hearing record, objected to their being received in evidence as the indirect product of an illegal search and seizure—then we would have had a situation comparable

---

1.  277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

to a criminal trial in which the exclusionary rule applies. Then we would have had the straightforward question, as yet undecided by the Supreme Court, as to whether the exclusionary rule in criminal trials applies in Congressional hearings.

All the logic of the majority opinion seems to be directed to supporting an affirmative answer to a question of admissibility arising from this hypothetical fact situation, where the items of evidence offered in the Congressional hearing are the same items made the subject of a previous search and seizure violating Fourth Amendment rights. But here the evidence to be suppressed—under the exclusionary rule—is the Congressional subpoena itself manufactured by the Subcommittee staff, not evidence taken illegally from the McSurelys.

If it is the physical *document itself*, the subpoena, which the majority would suppress—and this is the holding—that document never belonged to the McSurelys, was never in their possession, no rationale of the "exclusionary rule" has any applicability to it. If it is the *knowledge* reflected in the content of the subpoena, the Subcommittee already had a substantial portion of such knowledge, suppressing the subpoena itself would have no effect whatsoever in eradicating such knowledge, and no logic of the "exclusionary rule" nor previous court decision has *barred Congressional use of knowledge*, no matter how obtained. The extraordinary ramifications of a rule which would forbid Congressional use of information—the inherent constitutional, precedential, and practical problems—are nowhere discussed or even hinted at in the majority opinion.

B. *Subpoena Enforcement or Suppression as Evidence*

Taking the subpoena itself as the critical issue, Judge Matthews' opinion appears to rest on dicta in Silverthorne Lumber Co. v. United States,[2] which at least does focus on the more relevant question of when a subpoena will be enforced, in contrast to the confusing concept of suppressing the subpoena document as an item of evidence under the exclusionary rule. With all due respect, I believe that refusal here to enforce a legislative subcommittee's subpoenas duces tecum, demanding production of documents of which it learned as a result of an illegal search by state officials, constitutes a most unfortunate and unwarranted extension of overbroad and ill-chosen language in *Silverthorne*.

In *Silverthorne* Justice Holmes properly refused to allow a subsequent regular subpoena to remove the taint on evidence which had been discovered in a previous illegal search, *for the purposes of a grand jury investigation in a criminal case*. It must be noted that the investigation there was aimed solely at *criminal* proceedings *against the same parties* whose Fourth Amendment rights had been violated. Since the established rule barred use of evidence illegally obtained, the Fourth Amendment would indeed have been reduced to "a mere form of words" if the subsequent *resulting* "legal" subpoena process was allowed to serve its sole intended purpose of "washing" the evidence to allow its admission in one stage of a criminal case.[3] Since the subpoenas could serve no other valid purpose, the Court refused to enforce them.

It thus appears that *Silverthorne* was centrally premised on the established doctrine excluding illegally obtained evidence in a criminal case directed against the person whose Fourth Amendment rights had been violated. When the Court there said that such evidence "shall not be used at all", it can only be reasonably understood to have referred

---

2. 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

3. The knowledge obtained from the illegal search would have made the subpoenaed documents, in effect, their own "fruit."

to use of the evidence *in any fashion in such a criminal case.*[4]

If there were a similarly established principle that "tainted" evidence may not be introduced before a legislative inquiry (which is not directed "against" anyone),[5] and may not be considered in any fashion for any purpose, I would have to agree with the majority's view of this case. However, the application of the exclusionary rule to Congress has *not* been established; and that question has emerged as the most important controverted issue in this case. Although the majority appears to assume such an application, I feel strongly that blanket exclusion of all "tainted" evidence from legislative inquiries or consideration should not be established as a principle of law. If, as I will attempt to show, illegally sought and taken evidence may not be "excluded" from Congressional consideration, the Subcommittee had a right to insist on its production.[6] And the McSurelys had no right, under the indirect *Silverthorne* analysis, to refuse.

## II. Rationale for Applying Exclusionary Rule to Congressional Inquiries

### A. Congress and Courts—Distinctions

Although the Fourth Amendment right to be free from unreasonable searches and seizures does apply, like many other constitutional protections, to Congressional inquiries,[7] the landmark cases which have established and expanded the exclusionary rule nowhere suggest that it applies outside of the context of criminal proceedings.[8] Two important distinctions are decisive in analyzing any rationale for applying the exclusionary rule to Congressional inquiries.

First, we must never obscure the highly important distinction between the constitutional *right* and whatever *remedy* may be thought appropriate, effective and necessary to protect that right. To be free from unreasonable searches and seizures is the right. The exclusionary rule is a remedy found, not in the Con-

4. The majority opinion is just another instance in which "the juice of [Justice Holmes' words'] context has been squeezed from them, and the husks used as a premise for a syllogism he never contemplated." In re Egan, 450 F.2d 199, 230 (3rd Cir. 1971) (Gibbons, J., dissenting). Judge Adams' language to the contrary in the majority opinion for the Court of Appeals in this case was impliedly rejected by the opinion for the Supreme Court in United States v. Egan, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (decided June 26, 1972).

5. See United States v. Fort, 143 U.S.App. D.C. 255, 443 F.2d 670, 679 (1970), cert. denied, 403 U.S. 932, 91 S.Ct. 2255, 29 L.Ed.2d 710 (1971).

6. As the latter part of this opinion will demonstrate, the Subcommittee only has a right to insist on the production of evidence pertinent to the subject of its inquiry. On that quite distinct ground, these convictions must be reversed.

7. See Watkins v. United States, 354 U.S. 178, 188, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1954); McPhaul v. United States, 364 U.S. 372, 382–383, 81 S.Ct. 138, 5 L.Ed. 2d 136 (1960); cf. Note, The Applica-

tion of the Fourth Amendment to Congressional Investigations, 52 Minn.L.Rev. 665 (1968).

8. Since the exclusionary rule is, after all, a rule of evidence, it would appear that its next "logical" extension would be to *civil cases* in which the Government is a party. Significantly, the Supreme Court has never gone that far. Note, Constitutional Exclusion of Evidence in Civil Litigation, 55 Virginia Law Review 1484 (1969); Cleary v. Bolger, 371 U.S. 392, 403, 83 S.Ct. 385, 9 L.Ed.2d 390 (1963) (Goldberg, J., concurring).
Congress could, of course, provide by statute for an exclusionary rule in relation to its own investigations. As the Government notes, it has done so with respect to illegal wiretaps in 18 U.S.C. § 2515. However, it should also be noted that no such special statutory provision would have been necessary if the judge-made exclusionary rule already extended as far as the appellants claim. The legislative history indicates that Congress, when it passed § 2515, clearly understood that the traditional "exclusionary rule" was limited to criminal proceedings. See Sen.Rep. No. 1097, 1968 U.S.Code, Cong. & Admin.News, p. 2112.

stitution, but in judge-made law, beginning with *Weeks* [9] in 1914. This judicially-created technique for deterring illegal intrusions has certainly never been thought to follow, inexorably, in any context, merely because a Fourth Amendment violation has occurred.[10]

Secondly, whatever the appropriateness of the exclusionary rule as a remedy in courts of law in a criminal trial, or perhaps in a civil action, the same rationale certainly does not apply in hearings before a Congressional committee.[11] The objectives of a Congressional hearing and a criminal trial are so obviously widely different. The criminal trial is to determine guilt or innocence of an individual subject to specific accusations. The Congressional hearing is for the gathering of information, the formulation of broad conclusions, the determination of national policy—all to be embodied subsequently in legislation, if after

hearings, deliberation and debate such legislation is thought desirable or needed.

Two simple examples illustrate the unwisdom of applying the exclusionary rule to Congressional committees.

As a relevant example, let us assume that much of the identical information which the Subcommittee sought here in the McSurelys' documents was published in a series of newspaper articles. Subsequently, it is revealed that every fact recited was gained by an illegal search conducted by a state governmental agency, which made no effort to contact any federal agency or Congressional committee. Let us further assume that the people responsible are successfully prosecuted for the illegal search. Everything obtained by that search is inadmissible in a court proceeding. Should the Congressional committee be denied the use of any of the information contained in

---

**9.** Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

**10.** See Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) ; Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958) ; United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966) ; Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ; United States v. Schipiani, 435 F.2d 26 (2d Cir. 1970) ; United States ex rel. Sperling v. Fitzpatrick, 426 F.2d 1161 (2d Cir. 1970).

**11.** The majority opinion nowhere faces up to these two vital distinctions. Judge Matthews asserts "There is nothing in logic or history of the 'exclusionary rule' to support its inapplicability to legislative subpoenas framed upon information derived by the Government through a previous unconstitutional search", and then quotes Mr. Justice Brandeis dissenting in Olmstead v. United States, 277 U.S. 438, at 478, 48 S.Ct. 564, at 572, 72 L.Ed. 944 : "To protect, that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, *must be deemed a violation* of the Fourth Amendment." With all due respect, how does this settle the questions as to (1) the appropriate remedy for the violation, or (2) the applicability of the same remedy to court trials and Congressional investigations?

Nor are the next authorities cited any more helpful. *Weeks, supra,* is quoted to the effect: ". . . The duty of giving to it [Fourth Amendment] force and effect is *obligatory upon all entrusted under our Federal system with the enforcement of the laws.*" 232 U.S. 383, at 392, 34 S.Ct. 341, at 344, 58 L.Ed. 652. But, of course, Congress is not "entrusted with the enforcement of the laws"; that is the role of the Executive and Judicial branches, Congress is the law*maker,* and quite different considerations may come into play, as the text illustrates.

Certainly Watkins v. United States, 354 U.S. 178, at 188, 77 S.Ct. 1173, at 1179, 1 L.Ed.2d 1273 (1957), holds that "The Bill of Rights is applicable to [Congressional] investigations as to all forms of governmental action. Witnesses . . . cannot be subjected to unreasonable search and seizure." But again, this in no way settles the questions of the appropriate remedy or the applicability of the same remedy in a court trial and Congressional hearing. And in United States v. Fort, 143 U.S.App.D.C. 255 at 263, 443 F.2d 670 at 678 (1971), relied on by the majority here, when we cited *Watkins* we immediately commented "But which constitutional rights are applicable depends on the nature and consequences of the governmental action." We might well have added a comment in similar vein as to applicable remedies.

the newspaper story because it was based on an illegal search, which constitutes information that could not be received in a criminal trial? Could the Congressional committee be barred from follow-up leads derived from this newspaper story by the application of the "fruit of the poisonous tree" doctrine? Should subpoenas to obtain documents from the McSurelys—just as clearly as in the case at bar derived originally from illegally obtained information—be suppressed on the rationale of the exclusionary rule, as the appellants urge here? I think not. I think the Congressional committee could take this information, illegally obtained and thoroughly inadmissible in a court of law, and utilize it for whatever purpose in a Congressional hearing.

As a second example, let us suppose a series of some 100 narcotic arrests within a limited area and period of time in the District of Columbia. It turns out that all arrests were made under faulty procedures. All seized heroin is suppressed in the criminal prosecutions. But if the Congress is weighing a narcotics law for the District of Columbia, such as was passed in 1970, or some particular provision such as nighttime searches and seizures, would it not be relevant and permissible for the Congressional committee to receive evidence tendered by the police on all details of these 100 arrests? I think clearly so. The Congressional committee could not be denied knowledge of the crimes nor

any of the specific details of these crimes, while the jury in the criminal case would not be permitted any knowledge of the seizure of the heroin itself.

Not only are the *objectives* of all Congressional actions so different from those of a criminal trial in court—as different as the constitutionally designed functions of the legislative and judicial branches—but pragmatic evaluation of the *results* to be obtained demonstrates that the exclusionary rule has no application to legislative hearings.

The unwisdom of applying the exclusionary rule to Congress is clear when we examine how well its primary purpose of deterring official misconduct would be served by such an application.[12] Many respected authorities have expressed doubts that law enforcement officials monitor their conduct in response to the consequences flowing from their mode of search in resulting criminal cases.[13] It seems even more doubtful that a remote hypothetical effect on derivative Congressional use of discovered information could possibly figure significantly in these officials' motivations.[14] Will the "cop on the beat," or even the Commonwealth's Attorney in the mountains of Eastern Kentucky involved with the McSurelys here, alter his conduct if the exclusionary rule is applied to Congressional hearings? Enforced legislative ignorance is just too attenuated a form of discipline on the police to justify its obvious costs.[15]

12. "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L. Ed.2d 1669 (1960); see also Terry v. Ohio, 392 U.S. 1, 12, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

13. See Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 415–416, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C. J., dissenting).

14. It is important to note that there has been no suggestion in this case that the

state police were acting as agents for the Subcommittee.

15. The majority opinion relies on Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L. Ed.2d 1081 (1961), and Elkins v. United States, 364 U.S. 217, 80 S.Ct. 1437 (1960), without ever comparing the role of a Congressional investigation to a state prosecution (*Mapp*) or to a federal prosecution based on evidence obtained by the state and turned over to federal authorities on a "silver platter" (*Elkins*). It was a long time, from *Weeks* (1914) to *Elkins* (1960), before the Supreme Court decided that the exclusionary rule in federal courts could possibly be effective in protecting against illegal searches and

In part, the exclusionary rule is designed to protect against the double indignity of *conviction* resulting from a Fourth Amendment violation.[16] It has no direct relationship to other adverse consequences of the illegal search, such as embarrassing publication of the discovered facts.[17] Its inappositeness in a legislative investigation setting is highlighted by asking exactly what result "suppression" would be expected to produce. Could the legislation suggested by the Subcommittee be invalidated for insufficient "evidence" in the official record? Assuming the facts are first widely publicized by the state officials, as they were here, how are the victims of the illegal search further injured in their expectations of privacy by the requirement that the documents be produced in a closed committee hearing? If serious narcotics problems, or indeed the misconduct of government officials, are exposed by police inquiries which violate the Fourth Amendment, derivative evidence may of course be inadmissible before a court—and the

searchers may in fact be liable for damages or guilty of a crime. Would that circumstance alone justify foreclosing Congressional access to the best possible sources of information on subjects of vital national concern?

Congress, as even its critics will agree, desperately needs information upon which to act. It has traditionally been given broad powers of investigation with which to meet that need.[18] Unless we are to assume that Congress should remain pristine and naive, much of the data it should consider will inevitably come to its attention in thoroughly unadmirable ways.

Conscious disregard of unquestioned facts, merely because they have come out in the open in a particular manner, has been vigorously challenged even as an artificial judicial nicety. This attempt to impose such an ivory tower mentality on the legislative battlefield is even more unreal and unworkable.

Whereas exclusion in the criminal area may reassure citizens in their con-

---

seizures by *state* officials. How can the majority here blithely assume that the application of the exclusionary rule (to a Congressional subpoena) in federal courts will, or should be, effective in regulating the conduct of Congressional committees? Or, to put it another way, how can the majority assume that the application of the exclusionary rule (to documents or information originally obtained by state authorities illegally) in a Congressional hearing will, or should be, effective in regulating the conduct of state authorities?

The necessity·of phrasing the above question alternately illustrates what I consider to be the obscurity and perhaps confusion in just what the majority thinks should be barred by the exclusionary rule here. See Part IA, *supra.*

16. See Walder v. United States, 347 U.S. 62, 64–65, 74 S.Ct. 354, 98 L.Ed. 503 (1954). The argument that the integrity of the courts would suffer from any involvement with the "dirty business" of violating constitutional rights seems most forceful when the court refuses to convict someone for violation of the law on the basis of evidence gathered through official lawlessness. On the other hand, the fact that a person's Fourth Amend-

ment rights have been violated clearly cannot excuse him from future compliance with the duties imposed by law. Substantial constitutional questions, never contemplated by the authors of the exclusionary rule, would arise if past illegal intrusions by a state executive branch are to excuse future compliance with the citizen's duties to the federal legislature.

17. Other remedies may, of course, be available against those who have actively intruded or published without a legal right to do so.

18. Congress may not of course investigate solely to persecute potential witnesses. The McSurelys have not convincingly alleged that the Subcommittee was acting for any purpose other than the legitimate gathering of information on which to base legislative proposals. The argument could be made that since the Subcommittee's agent, Mr. Brick, had already seen the documents before issuance of the subpoenas, they could only have been issued for purposes of harassment. To the contrary, the Subcommittee could not know whether it had all such documents and, on the face of the subpoenas, was seeking any additional ones which might have existed.

fidence that their government's executive will be a *law abider*, denial of information to Congress will neither provide meaningful deterrence nor reassure citizens that their government's legislature will be a worldly-wise *lawmaker*. While the courts may refuse to allow their criminal processes to become tainted by eating the "fruit of the poisonous tree," it would be folly to forbid Congressional knowledge that bad apples exist and to stymie Congressional action on the basis of all information, good or bad in origin. It must be remembered that the subpoenas, and not the documents sought, were the relevant (and unpoisoned) fruits which the trial *court* was asked to eat in this contempt case. As the analysis of *Silverthorne* above shows, the subpoenas must fail only if *Congress* may never eat the fruit of a tree which someone else has poisoned.

**B.** *Effect of Congressional Participation in Search*

Arguably, some degree of *active* participation by the Subcommittee's investi-

gator in a violation of the McSurelys' Fourth Amendment rights, if that violation was also the sole source of the information upon which the subpoenas were issued, might justify refusal to enforce the subpoenas. As previously noted, the Fourth Amendment does apply to Congressional committees.[19] If an agent of the Subcommittee had searched the McSurelys' home,[20] perhaps refusal to enforce the resulting subpoenas would be the only available or effective deterrent of such official lawlessness.[21]

Mr. Brick's inspection of the documents in Mr. Ratliff's custody[22] might be viewed as an illegal search by an agent of the Subcommittee which should be deterred by denying any further enforceable subpoena power to the Subcommittee regarding information so discovered.[23] However, such a view of this case would create more problems than it solved.

First it would require a remand to determine whether what Brick *passively*

---

19. Watkins v. United States, 354 U.S. 178, 187–188, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957) ; see also United States v. Fort, *supra* note 5, 443 F.2d at 678.

20. Compare Nelson v. United States, 93 U.S.App.D.C. 14, 208 F.2d 505 (1953), in which a Senate committee agent's illegal search led to exclusion of the evidence seized in a subsequent criminal trial.

21. If Mr. Brick is shown to have believed in good faith that Mr. Ratliff had authority to show him the documents, it seems doubtful that his examination could be considered a crime. It is also possible that personal liability for damages would be barred by the doctrine of official immunity. See Doe, et al. v. McMillan, 148 U.S.App.D.C. 280, 459 F.2d 1304, 1316–1318 (1972) ; see also Dombrowski v. Burbank, 123 U.S.App.D.C. 190, 358 F.2d 821 (1966).

22. It appears that Mr. Brick first examined only xeroxed copies of the documents. Defendant's Appendix (hereafter "D.A."), Vol. II, p. 1032. If he had stopped there, this might be a different case. *Ratliff* might have violated the McSurelys' Fourth Amendment rights by xeroxing the material and displaying the

copies. But it would be hard to distinguish *Brick's* view of the copies from his hearing them read over the phone or reading verbatim reprints in the newspaper. Without deciding the issue, I would find it hard to characterize the latter two activities as a "search."

23. It would not appear that the custodian's consent should operate to legalize this "search." Ratliff was directed by the court to hold the papers "in safe keeping" pending appeal. D.A. Vol. II, p. 962. Since the original seizure had been declared illegal, the natural inference would be that he was holding them *for the benefit of the McSurelys*, subject to reversal on appeal. They, of course, were never notified or given a chance to voice their strong objections to the "search." See Note, Third Party Consent to Search and Seizure, 33 U. of Chicago L.Rev. 797, 812 (1966), for the argument that actual authority to consent is necessary to validate a warrantless search. See also Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), which implies, *inter alia*, that the good faith belief of the official searcher that he has obtained valid consent does not validate his act.

learned from Ratliff and others, rather than what he found in his *active* examination of the documents, provided a sufficient foundation for the issuance of the subpoenas.[24] If Brick's illegal search took place *after* the Subcommittee had enough information on which to draw the subpoenas, the subpoenas could not be said to have derived from the search, and overturning the contempt convictions would appear less appropriate as a deterrent.

Second, although Brick's examination of the McSurelys' documents may be characterized as an illegal subcommittee action, passive reception of illegally seized information from others cannot even properly be termed a "search." The preceding discussion makes clear that mere reception by the legislature of "tainted" evidence should not be prohibited. If Mr. Ratliff, the court-appointed custodian, had disclosed the documents to the whole world, the Subcommittee could listen in without being held to have an active role in that violation of the McSurelys' expectations of privacy. Thus, barring these subpoenas because Brick and the press were not merely told everything by the custodian would amount to excluding evidence from Congressional consideration because the McSurelys' rights to privacy had not been violated thoroughly enough!

Third, if Brick's examination of the documents can be termed a search, the inspection by one law enforcement agency of documents in the custody of another might, by extrapolation, also be characterized as a search—possibly illegal if the custodian agency's original seizure was held unlawful. The exclusionary rule now makes any descriptive nomenclature of the sampling of items on the tarnished "silver platter" irrelevant with regard to admission of evidence in a criminal case. The evidence is barred in court without consideration of whether what the federal officers did was a search or not. However, troublesome questions would arise concerning the personal liability of law enforcement officers if a second "search" were recognized in those circumstances. Given the need for cooperation in law enforcement, I would be reluctant to adopt that view; but the myriad possible problems in drawing a line short of such an extrapolation are evident.

Finally, the most likely effect of such a ruling would be a slight change in the behavior of subcommittee staff investigators. Once they were contacted by a custodian of documents such as Mr. Ratliff, willing to violate the court's command and the McSurelys' rights, they would merely request that he leak *everything* to the press, send along only xeroxed copies, or place the documents in plain view and stand by to turn the pages.[25]

Rather than wander into the thicket of overfine and troubling distinctions generated by a theory of the case based on Mr. Brick's role, I would prefer to rest the decision here on a ground less likely to produce a remand in this case and less open to dangerous extrapolation in others.

---

24. The appellants claim that the Government concedes that the subpoenas would not have been issued without the Subcommittee's "opportunity to examine the documents." D.A. Vol. II, p. 940, No. 10. However, the court below found only that the Subcommittee would not have known of the documents "but for [the] . . . seizure by the state officials." D.A. Vol. II, p. 972. A stipulation in McSurely v. Ratliff indicates that Mr. Brick learned a great deal about the nature of the documents merely by questioning Mr. Ratliff (which could hardly be characterized as a search), D.A. Vol. II, p. 1031.

25. The exact nature of subcommittee action which would suffice to place it in an "active" role is unclear. What cannot be denied is that legislative use of illegally seized evidence would hardly end even if committee investigators avoided all personal involvement in official misconduct. Even dispensing with an overt request would probably not discourage law enforcement officials from sending along documents which appeared likely to be of interest to Congress.

### III. Pertinency

The sounder ground upon which the McSurelys' convictions for contempt must be reversed is the failure of the Government to establish one of the necessary elements of its case: pertinency of its demands to the valid subject of the legislative inquiry.

Proof of pertinency is an affirmative element of the Government's case in any prosecution under 2 U.S.C. § 192. Deutch v. United States;[26] Bowers v. United States.[27] Although the words of the statute literally can be read to suggest that this requirement only applies to questions, the pertinency requirement has been correctly construed to apply to all aspects of the legislative investigation—including a subpoena duces tecum for the production of documents.[28] While the legislature can demand any documents it wishes, it can only punish refusal to cooperate when its demands are shown to be limited to the permissible and actually authorized scope of the inquiry.[29]

Most broadly construed, this legislative inquiry concerned the causes of riots and general disorders. The Chairman of the Subcommittee articulated that purpose in his opening statement.[30] Some of the subpoenas' demands arguably related to such an inquiry. However, many have no such apparent connection.

Notably, there is absolutely nothing in the record[31] to suggest that the McSurelys' relationship to Appalachian Volunteers, United Planning Organization, Vietnam Summer, or National Conference for New Politics had anything at all to do with crime, violence or riots. If some connection existed, it was up to the Government to show that connection at the contempt trials. In contrast to these four organizations, the Government did demonstrate at the trial the pertinency of the inquiry in regard to three other organizations, by showing their possible connection with the riots which were the legitimate objects of the Subcommittee's inquiry.[32] In the absence of such a showing, it appears that in regard to the four organizations named above the Subcommittee was diverted from its investigation of riots to

26. 367 U.S. 456, 81 S.Ct. 1587, 6 L.Ed.2d 963 (1961).

27. 92 U.S.App.D.C. 79, 202 F.2d 447 (1953).

28. United States v. Orman, 207 F.2d 148, 153 (3rd Cir. 1953); Marshall v. United States, 85 U.S.App.D.C. 184, 176 F.2d 473, 474 (1949), cert. denied, 339 U.S. 933, 70 S.Ct. 663, 94 L.Ed. 1352, rehearing denied, 339 U.S. 959, 70 S.Ct. 976, 94 L.Ed. 1369. One possible argument for reading the statute not to require pertinence of a subpoena is that the Congressional committee cannot precisely articulate the relevance of documents before it has seen them. However, here, that argument pales in light of the fact that an agent of the Subcommittee was, to say the least, thoroughly familiar with most of the McSurelys' personal effects.

29. Bowers, supra, 202 F.2d at p. 448.

30. D.A. Vol. I, pp. 536–48.

31. D.A. Vol. II, pp. 1041 et seq. (Excerpts of Hearings before the Subcommittee stated by the Government to be evidence of pertinency of the documents subpoenaed.)

32. The subject of the Subcommittee's investigation, the then prevalent disorders, obviously included subsidiary and pertinent questions concerning the possibility of conspiracy to foster large-scale rioting. Unquestionably, there was evidence that the McSurelys had attended several meetings in Nashville immediately preceding the riots there. These meetings involved members of SNCC, SCEF and SSOC. D.A. Vol. II, pp. 1041 et seq. Some of the meetings took place at the "SSOC House." They included official organizational meetings of SCEF. At least one meeting featured an address by a prominent SNCC member, apparently entitled "SNCC, Black Power for Communism." It could not escape the Subcommittee's attention that at least certain of the participants in these meetings appeared to be involved in instigation or precipitation of the Nashville riots. Thus, the McSurelys' connections with these three organizations would have been pertinent objects of inquiry if the Subcommittee subpoenas had been so limited.

an investigation of the McSurelys[33]—a nonpertinent inquiry for which the contempt powers are not available.

In Bowman Dairy Co. v. United States,[34] the Supreme Court held that

One should not be held in contempt under a subpoena that is part good and part bad. The burden is on the court to see that the subpoena is good in its entirety and it is not upon the person who faces punishment to cull the good from the bad.[35]

Accordingly, as some of the subpoenas' demands were not shown to be pertinent to the legislative inquiry, the District Court erred in refusing to grant appellants' motion for judgment of acquittal and the McSurelys' convictions should be reversed.

33. " '[P]ertinent', as used to describe a requisite for valid congressional inquiry, means pertinent to a subject matter properly under inquiry, not generally pertinent to the person under interrogation." Rumely v. United States, 90 U.S.App. D.C. 382, 197 F.2d 166, 177 (1952), aff'd, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953).

34. 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951).

35. 341 U.S. 214, 221, 71 S.Ct. 675, 679, 95 L.Ed. 879. Followed by this court with respect to refusal to comply with a Congressional subpoena. United States v. Patterson 92 U.S.App.D.C. 222, 206 F.2d 433 (1953).